No. 84,835

MICHAEL P. MITCHELL, *Plaintiff/Appellant/Cross-appellee,* v. LIBERTY MUTUAL INSURANCE COMPANY, *Defendant/Appellee,* and SHELTER MUTUAL INSURANCE COMPANY, *Defendant/Appellee/Cross-appellant.*

(24 P.3d 711)

Opinion filed June 8, 2001.

*Patrick A. Hamilton*, of Robert G. Herndon, Chartered, of Overland Park, argued the cause, and *Robert G. Herndon*, of the same firm, was with him on the briefs for appellant/cross-appellee.

*Paul Hasty, Jr*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, argued the cause, and *David Curotto*, of the same firm, was with him on the brief for appellee Liberty Mutual Insurance Company.

*William A. Larson*, of Gehrt & Roberts, Chartered, of Topeka, argued the cause, and *Craig C. Blumreich*, of the same firm, was with him on the brief for appellee/cross-appellant Shelter Mutual Insurance Company.

The opinion of the court was delivered by

DAVIS, J.: The question we must resolve in this appeal is which of two separate policies providing underinsured motorist coverage applies to the plaintiff's damages. Plaintiff Michael P. Mitchell claimed Kansas law mandated that his employer's insurance contract with Liberty Mutual Insurance Company (Liberty) provide underinsured coverage equal to the limits of the liability coverage based upon the employer's failure to properly reject such coverage under K.S.A. 40-284. The trial court awarded summary judgment in favor of Liberty, concluding that the employer did reject the

higher coverage, with the result that Mitchell's individual policy provided the only underinsured coverage for him. The trial court awarded Mitchell postjudgment interest, but only from the date the court determined that Mitchell's individual policy was responsible and only in an amount due under such policy. We affirm the decision of the trial court in part and reverse in part.

On November 1, 1991, Mitchell suffered bodily injury in a motor vehicle accident which occurred while he was operating a vehicle for the United Parcel Service (UPS). UPS was insured by Liberty under a policy which provided for liability coverage of $5,000,000. The policy expressly provided uninsured/underinsured motorist coverage in an amount equal to the Kansas minimum coverage requirement: $25,000 per person and $50,000 per accident. Mitchell was insured by defendant Shelter Mutual Insurance Company (Shelter). The Shelter policy provided uninsured/underinsured motorist coverage in the amount of $100,000 per person and $300,000 per accident.

Mitchell filed suit against the driver of the other automobile, Loretta Leonard, who was insured by Mid-Century Insurance Company (Mid-Century). Mid-Century tentatively offered to settle Mitchell's claims in exchange for its policy limit of $50,000. Mitchell provided both Liberty and Shelter with notice of the offer. Liberty refused to substitute payment or intervene. Shelter refused to substitute payment but did intervene to protect its interests.

All parties to the action reached a settlement in favor of Mitchell in the amount of $950,000, which the trial court reduced to $890,000 pursuant to the caps provided for in K.S.A. 60-19a02. This sum was reduced by $50,000 which had previously been paid by Leonard's insurance company, Mid-Century. After a hearing, the settlement was approved by the trial court. Within the same action, Mitchell attempted to enforce his underinsured motorist benefits under the Liberty policy and his own Shelter policy. The trial court, pursuant to Mitchell's request, involuntarily joined Liberty as a party and entered summary judgment against Liberty for Mitchell's underinsured coverage.

The resulting judgment against Liberty was overturned by this court in *Mitchell v. Liberty Mut. Ins. Co.*, 265 Kan. 556, 961 P.2d

1235 (1998), wherein we found the district court had no jurisdiction over the underinsured motorist coverage dispute in the same action which determined plaintiff's damages. We held that the underinsured coverage dispute must be resolved by separate action from the damage action. Mitchell then filed the present action against Liberty and Shelter.

Mitchell claimed Liberty was liable for his underinsured motorist claim of $840,000 notwithstanding its policy provision limiting its liability for underinsured motorist coverage to $25,000 per person and $50,000 per accident. His claim was based upon K.S.A. 40-284, which provides that for policies issued in Kansas, uninsured/underinsured coverage is to be "equal to the limits of liability coverage" absent a valid rejection of such coverage by the insured named in the policy. Mitchell contended that no valid rejection was ever executed by the insured, UPS. The parties stipulated that Mitchell's claim against his own policy with Shelter would be effective only if it were determined that Liberty's coverage liability is limited to $25,000 per person and $50,000 per accident. In that event, Shelter's $100,000 per person and $300,000 per accident coverage would provide the primary underinsured motorist coverage for Mitchell. Mitchell also advanced claims for pre-and postjudgment interest against both Liberty and Shelter depending upon the determination of which carrier provided primary underinsured motorist coverage.

### Summary Judgment Motions

Liberty filed a motion for summary judgment. Mitchell countered with a motion for summary judgment of his own. In order to understand the positions of the parties, a digression into the law regarding underinsured motorist coverage is necessary. Under K.S.A. 40-284(b), uninsured motorist coverage must include an underinsured motorist provision with coverage limits equal to the uninsured provision. Under K.S.A. 40-284(a), the policy limits of an uninsured motorist provision must be equal to the liability coverage in the insurance policy. Therefore, under those two sections of the statute, underinsured motorist coverage in an automobile policy must have coverage limits equal to the liability coverage of

the policy which, in the case of Liberty's policy, was $5,000,000. However, K.S.A. 40-284(c) provides that the insured has the right to reject uninsured and underinsured motorist coverage in excess of the minimum required by law, *i.e.* $25,000 per person/$50,000 per accident or $50,000 single limit, by giving the insurance company written rejection of the excess. Further, the statute provides that after a valid rejection, the insurer need not include excess insurance in any subsequent policy of the insured unless the insured specifically requests such excess coverage in writing. K.S.A. 40-284(c).

The Liberty policy covering UPS at issue in this case, policy No. AS1-621-004175-339, was issued in 1989 and was effective until 1992. The policy includes uninsured motorist coverage in the amount of $25,000 per person/$50,000 per accident. In 1989, the first year of the policy, Liberty sent UPS a form entitled Kansas Uninsured Motorists Insurance Excess Limits Rejection. The form provided a place for UPS to state in writing that it was rejecting uninsured motorist coverage equal to the liability limit in the policy and to write in the smaller amount of its choosing, subject to the statutory minimums of $25,000 per person/$50,000 per accident or $50,000 per single limit. While UPS signed and remitted the form, the space to select the limits was left blank.

Nevertheless, Liberty argued that UPS had rejected higher limits in 1984 and that this rejection was still valid under K.S.A. 40-284(c) because once an insured rejects higher uninsured motorist coverage by written waiver, that waiver remains effective until the insured selects higher limits. In support of this contention, Liberty attached a copy of the 1984 rejection, along with the affidavit of Albert Sharlun, account executive of the UPS account.

Mitchell countered with his own motion for summary judgment objecting to the affidavit of Albert Sharlun based upon the provisions of K.S.A. 60-256(e). In its response to Mitchell's motion, Liberty asserted that UPS had actually executed rejections in 1990 and 1991 but that these rejections referenced an incorrect policy number because Liberty employees incorrectly assumed that the policy was renewed every year rather than every 3 years. The 1990 rejection purported to select the minimum limits of $25,000/$50,000,

while the 1991 rejection purported to select the minimum single limit of $50,000. In his response, Mitchell contended that the underinsured motorist limits in the policy were inserted by UPS and argued that the incorrect policy number made the rejections invalid.

### District Court Decision

The district court awarded summary judgment in favor of Liberty, holding:

"5. After Kansas law was changed in 1982 to require underinsured motorist benefits, UPS rejected in writing coverage in excess of that set forth in paragraph 2 [coverage limits equal to the liability coverage of the policy].

"6. That rejection is exhibited as an attachment to the affidavit of Albert Sharlun, which is Exhibit A to defendant Liberty Mutual's motion for summary judgment.

"7. K.S.A. 40-284 in its various forms since 1982 has provided that once a written rejection has been received by an insurer, no further rejection is necessary in subsequent policies.

"8. Notwithstanding that it may be Liberty's corporate policy to obtain written rejections every year, the rejection issued by UPS in 1984 was sufficient to limit the underinsured coverage to $25,000/50,000 at the time of plaintiff's accident."

The trial court also determined that Shelter was obligated to pay Mitchell $50,000 under its underinsured motorist coverage. The court ruled that questions regarding Shelter's liability for prejudgment interest remained outstanding.

Mitchell filed a motion to alter and amend the judgment to allow an appeal of the summary judgment ruling pursuant to K.S.A. 60-254(b) which the trial court denied. Mitchell then moved for summary judgment, seeking prejudgment interest against Shelter on the entire amount of the award of $840,000, commencing from the date of the settlement, March 29, 1995. Shelter responded, arguing that it was not obligated to pay prejudgment interest, or in the alternative, that it was only obligated to pay interest on the $50,000 of underinsured motorist coverage from October 12, 1999.

The trial court decided that Shelter was required to pay interest on the $50,000 it owed Mitchell and that this obligation ran from the time the obligation became "liquidated," which was October 12, 1999, the date that the court entered summary judgment in

favor of Liberty. Mitchell appealed all rulings. Shelter cross-appealed the ruling awarding summary judgment to Liberty. Our jurisdiction is based upon our transfer pursuant to K.S.A. 20-3018(c).

## Discussion

The trial court resolved the underinsured motorist coverage issue on the basis that the written rejection by Liberty in 1984 of its underinsured motorist coverage equal to its liability limits and fixing the same coverage at $25,000 per person and $50,000 per accident remained in effect at the time of Mitchell's accident. Since Liberty's underinsured motorist coverage of $25,000 was less than the amount Mitchell received in settlement from the other driver's insurer in the amount of $50, 000, Liberty's policy provided no uninsured/underinsured coverage. However, Mitchell's own policy provided $100,000 in underinsured motorist coverage, thereby making $50,000 available to Mitchell. The ultimate question resolving this dispute is a legal question involving the interpretation of K.S.A. 40-284.

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may be reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusion drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 (1999).

### K.S.A. 40-284

K.S.A. 40-284 set forth the requirements with regard to uninsured/underinsured motorist coverage in this state. Effective in 1982, the statute read, in pertinent part:

"(a) *No automobile liability insurance policy* covering liability arising out of the ownership, maintenance, or use of any motor vehicle *shall be delivered or issued for delivery in this state* with respect to any motor vehicle registered or principally garaged in this state, *unless the policy contains* or has endorsed thereon, *a provision with coverage limits equal to the limits of liability coverage* for bodily injury or death in such automobile liability insurance policy sold to the named insured for payment of part or all sums which the insured or the insured's legal representative shall be legally entitled to recover as *damages from the uninsured* owner or operator of a motor vehicle because of bodily injury, sickness or disease, including death, resulting therefrom, sustained by the insured, caused by accident and arising out of ownership, maintenance or use of such motor vehicle, or providing for such payment irrespective of legal liability of the insured or any other person or organization.

"(b) *Any uninsured motorist coverage shall include an underinsured motorist provision* which enables the insured or the insured's legal representative to recover from the insurer the amount of damages for bodily injury or death to which the insured is legally entitled from the owner or operator of another motor vehicle with coverage limits equal to the limits of liability provided by such uninsured motorist coverage to the extent such coverage exceeds the limits of the bodily injury coverage carried by the owner or operator of the other motor vehicle.

"(c) *The insured named in the policy shall have the right to reject, in writing, the uninsured motorists coverage required by subsection (a)* which is in excess of the limits for bodily injury or death set forth in K.S.A. 1980 supp. 40-3107. *Unless the insured named in the policy requests such coverage in writing, such coverage need not be provided in or supplemental to a renewal policy where the named insured had rejected the coverage in connection with a policy previously issued to the insured by the same insurer."* (Emphasis added.) L. 1981, ch. 191, § 1.

Thus, from 1982 to 1986, 40-284 required (1) that an insurer provide its insured uninsured motorist coverage equal to the liability limit of the policy; (2) the uninsured coverage include coverage for underinsured motorists; (3) the insured could reject this excess uninsured motorist coverage by written request, subject only to the minimum coverage amounts provided by law; and (4) once the insured had rejected excess coverage, the insurer need not provide such excess coverage in any renewal policy for the same insured. K.S.A. 40-284 (Ensley 1981).

In 1986, subsection (c) of the statute was amended as follows:

"(c) The insured named in the policy shall have the right to reject, in writing, the uninsured ~~motorists~~ motorist coverage required by subsection (a) which is in excess of the limits for bodily injury or death set forth in K.S.A. 40-3107 and amendments thereto. *A rejection by an insured named in the policy of the unin-*

*sured motorist coverage shall be a rejection on behalf of all parties insured by the policy.* Unless the insured named in the policy requests such coverage in writing, such coverage need not be provided in ~~or supplemental to a renewal policy~~ *any subsequent policy issued by the same insurer for motor vehicles owned by the named insured, including, but not limited to, supplemental, renewal, reinstated, transferred or substitute policies* where the named insured had rejected the coverage in connection with a policy previously issued to the insured by the same insurer." L. 1986, ch. 173, § 1.

From 1986 to 1988, the only substantive change was that in addition to not having to offer excess coverage in any renewal policy, the insurer did not have to offer excess coverage in *any* subsequent policy with the named insured. K.S.A. 40-284 (Ensley 1986).

In 1988, subsection (c) was again amended, as follows:

"(c) The insured named in the policy shall have the right to reject, in writing, the uninsured motorist coverage required by ~~subsection~~ *subsections* (a) *and (b)* which is in excess of the limits for bodily injury or death set forth in K.S.A. 40-3107 and amendments thereto. A rejection by an insured named in the policy of the uninsured motorist coverage shall be a rejection on behalf of all parties insured by the policy. Unless the insured named in the policy requests such coverage in writing, such coverage need not be provided in any subsequent policy issued by the same insurer for motor vehicles owned by the named insured, including, but not limited to, supplemental, renewal, reinstated, transferred or substitute policies where the named insured had rejected the coverage in connection with a policy previously issued to the insured by the same insurer." L. 1988, ch. 152, § 1.

The 1988 amendment made it clear that the right to reject excess coverage extended to underinsured coverage. See K.S.A. 40-284. There have been no further changes to the statute since the 1988 amendment, and that version of the statute is the one at issue in this case.

It is important to remember that the issue in this case does not involve an interpretation of the language of the insurance policy between Liberty and UPS in effect at the time of Mitchell's accident. That policy expressly provided for underinsured motorist coverage in the amount of $25,000 per person/$50,000 per accident. Rather, the argument involves the interpretation and application of K.S.A. 40-284. It is a question of law, and our scope of review is unlimited. *Hamilton v. State Farm Fire & Cas. Co*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

Mitchell advances seven reasons why the trial court erred in holding that the 1984 rejection by the insured UPS effectively set underinsured motorist coverage at $25,000 per person and $50,000 per accident: (1) the 1984 rejection was ineffective because the 1986 amendment which exempted insurers from offering underinsured coverage in excess of the minimum in subsequent policies with the same insured should not be applied retroactively to the policy in 1984; (2) it was the established practice of Liberty that unless UPS rejected the limits, the policy would be issued with underinsured motorist limits equal to the liability limit; (3) the 1989 form was not only ineffective to operate as a rejection, it actually operated as a *request* for underinsured limits equal to the liability limit of the policy; (4) no rejection form was ever "encompassed within the insurance policy" as required by the commissioner of insurance; (5) the 1984 rejection was not properly in evidence because Liberty failed to comply with K.S.A. 60-256(e) in presenting it; (6) the 1984 rejection was ineffective because the law at the time did not allow the rejection of underinsured motorist benefits equal to the liability limit of the policy; and (7) the 1984 rejection should have been excluded from evidence because the trial court failed to allow discovery concerning it. Mitchell also argues that the 1990 and 1991 rejections were ineffective and contends that the trial court should have awarded judgment in his favor along with prejudgment interest and attorney fees. Shelter joins Mitchell in these arguments.

(1) Mitchell contends that UPS's 1984 rejection was ineffective because the 1986 amendment which exempted insurers from offering underinsured coverage in excess of the minimum in subsequent policies with the same insured should not be applied retroactively to the policy in 1984. In order to understand this argument, some comparison between the law as it stood in 1984 and the law in 1986 is applicable. In 1984, K.S.A. 40-284 stated that once an insured had rejected excess coverage such coverage did not have to be offered in subsequent renewal policies with the same insured. K.S.A. 40-284(c) (Ensley 1981). In 1986, the statute was changed to provide that such coverage did not have to be offered in any subsequent policy issued by the same insurer for motor vehicles

owned by the named insured including, but not limited to, supplemental, renewal, reinstated, transferred, or substitute policies. K.S.A. 40-284(c) (Ensley 1986). Mitchell argues that when the 1984 rejection was completed it would have been effective only for renewal policies. He contends that the policy issued by Liberty on May 1, 1986, prior to the effective date of the 1986 amendment, was a new rather than renewal policy and that Liberty was thus required to again offer coverage limits equal to the limits of its liability coverage. Thus, according to Mitchell, the 1984 rejection could not continue in effect.

The 1986 policy in the record does not indicate whether it is a new policy or a renewal policy. The policy code provides that the 1986 policy is a "cancel/rewrite." The record is silent on what "cancel/rewrite" means. Nevertheless, Mitchell's argument concerning new and renewal voices the unanswered question of what the legislature meant in K.S.A. 40-284(c) (Ensley 1981) by its use of the words "renewal policy." Mitchell assumes that the 1986 policy is not a renewal. He argues that there remains a genuine issue of material fact as to whether the policy was a renewal policy. Thus, according to his argument, summary judgment was inappropriate.

The trial court did not directly address the above question, but its decision that the 1984 rejection resolved the question necessarily assumes that the 1986 policy, as well as the 1989 policy issued by Liberty, were renewal policies within the meaning of K.S.A. 40-284(c) (Ensley 1981). Liberty argues that "it does not matter whether the policy was a new or renewal policy. Either way, the new policy was simply a replacement for the prior policy."

The question we must resolve involves a question of statutory interpretation and the intent of the legislature in its use of the term "renewal policy" in K.S.A. 40-284(c) (Ensley 1981). The fundamental rule of statutory construction to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than

determine what the law should or should not be. *In re Marriage of Kilman,* 264 Kan. 33, 42-43, 955 P.2d 1228 (1998).

K.S.A. 40-284(c) (Ensley 1981) as set forth above uses the words "need not be provided in or supplemental to a renewal policy." The phrase "renewal policy" is not defined. Our research into the legislative history of this enactment provides no help in ascertaining legislative intent. Neither the district court nor the parties attempted to define, except in the most general way, what is meant by "renewal policy." The legislature recognized in subsection (c) that the rejection must be in writing. The UPS 1984 rejection was in writing and effective in providing underinsured motorist coverage of $25,000 per person and $50,000 per accident instead of coverage equal to the policy's liability limits. Thereafter, unless the insured named in the policy requests such coverage (coverage equal to the limits of liability coverage) such coverage need not provided "in or supplemental to a renewal policy" where the named insured had rejected the coverage in connection with a policy previously issued to the insured by the same insurer.

It appears that the legislature in subsection (c) intended to simplify further rejections in subsequent policies by the same parties by requiring the named insured to request in writing the higher coverage if desired. Where the parties remain the same and the coverage remains virtually identical, requiring further rejections within that existing relationship would run counter to the legislative intent to simplify the rejection process. Yet, there would be cases where coverage lapsed or where the terms of the coverage markedly changed within that relationship to signal that the new policy issued was not "supplemental to a renewal policy" requiring a new rejection. Again, the determination would depend upon what the legislature meant by renewal policy.

Black's Law Dictionary 1299 (7th ed. 1999) defines renewal as: "n.1. The act of restoring or reestablishing. 2. The re-creation of a legal relationship or the replacement of an old contract with a new contract, as opposed to the mere extension of a previous relationship or contract." We believe that this definition more accurately reflects what the legislature meant when it used the term "renewal policy." We further conclude that allowing a rejection in a previous

policy between the same parties to remain in effect absent another written request by the insured where the new coverage is virtually identical and reestablishes the relationship between the parties or where the new policy replaces the old policy with a new contract is consistent with the intent of the legislature.

The uncontroverted facts of this case establish that UPS dealt exclusively with Liberty over an extended period of time. The relationship existed from before 1984 through at least 1993. Moreover, there was uncontroverted testimony that the relationship in Kansas existed over 20 years. While there is evidence that the policy covering UPS is a 3-year policy, the terms of the liability coverage remained the same throughout this relationship with the exception of a gradual increase in the amount of liability coverage.

The provisions of the 1986 Liberty policy were virtually the same as the 1984 Liberty policy. Continual coverage existed between UPS and Liberty over an extended period of time with virtually identical provisions. The provisions of the 1984, 1986, and 1989 policies are identical and involve the same parties. Each policy after 1984 replaced an old policy with a new contract and consistent with the definition of renewal set forth above, we conclude that both the 1986 and 1989 Liberty policies were renewal policies within the provisions of K.S.A. 40-284(c) (Ensley 1981). Since UPS did not again after 1984 request increased underinsured motorist coverage in its renewal policies, underinsured motorist coverage at the time of Mitchell's accident remained the same as in previous policies, at $25,000 per person/$50,000 per accident.

In 1986, the legislature amended K.S.A. 40-284(c) to provide that a rejection would remain in effect for "any subsequent policy issued by the same insurer for motor vehicles owned by the named insured, including, but not limited to, supplemental, renewal, reinstated, transferred or substitute policies." L. 1986, ch. 173, § 1. An argument can be made that this subsequent change was an expansion of the circumstances where a prior rejection would remain effective and signifies that the prior law limited the continuing effect of the rejection only to those policies which explicitly provided that they were "renewal" policies. See *State v. Spain*, 263 Kan. 708, 711, 953 P.2d 1004 (1998) (when the legislature revises

an existing law, it is presumed that the legislature intended to change the law as it existed prior to the amendment). However, an equally valid argument can be made that the amendment in 1986 merely worked a clarification of the initial language consistent with the legislature's intent to simplify the rejection process. We believe that the latter interpretation is more consistent with the intent of the legislature, and where one policy replaces another policy between the same parties and contains substantially the same provisions, it qualifies as a "renewal" policy under the statute.

(2) Mitchell also contends that the 1984 rejection is not effective because it was the established practice of Liberty that unless UPS rejected the limits, the policy would be issued with underinsured motorist limits equal to the liability limit. Mitchell asserted this as a fact in his motion for summary judgment and Liberty controverted it, arguing that this was not the practice. Mitchell cites to the deposition of Albert Sharlun, the account executive on the UPS account. However, in the cited passage, Sharlun states that it is his policy to send a rejection form every year and the insured should reject the limits every year. He does not state that it is the practice of Liberty to issue a policy with underinsured motorist limits equal to the liability limit unless the insured specifically rejects the excess coverage each year. However, Mitchell also cites a letter from Liberty to the Kansas Commissioner of Insurance in February 1982. In this letter, J.R. Fontes, a staff assistant at Liberty, submitted endorsements for approval by the commissioner, including a sample rejection form. Fontes stated that for all policies effective January 1, 1982 or thereafter, new or renewal, the policyholder would be provided with a rejection form and uninsured motorist coverage would be provided at limits equal to liability unless the policyholder selected a lesser limit on the form.

While the above dispute may rise to the level of a genuine factual dispute, it is not material in light of the legislative intent expressed in K.S.A. 40-284(c) (Ensley 1981) concerning renewal policies. Under the statute, unless the insured, UPS, requested increased underinsured motorist coverage in its renewal policies of 1986 and 1989, that coverage remained at $25,000 by reason of the valid rejection in its 1984 policy. No further action was required by UPS

to insure the minimum coverage that existed at the time of Mitchell's accident. Any factual dispute concerning the 1986 and 1989 policies is not material and therefore would not preclude summary judgment. See *Bergstrom v. Noah,* 266 Kan. at 872 (holding that a disputed question of fact that is immaterial to the resolution of the issue does not preclude summary judgment).

(3) Mitchell argues that the 1984 rejection is not effective because the 1989 rejection form which was the first form sent to UPS under the policy in effect at the time of the accident was not only ineffective to operate as a rejection, it actually operated as a *request* for underinsured limits equal to the liability limit of the policy. Mitchell's contention is based on his interpretation of the rejection form. According to Mitchell, the form is not actually a "rejection" form but is instead an "excess limits endorsement form." Mitchell argues that where a form is left blank as it was in this case, it should be interpreted as a request for limits equal to the liability limit of the policy. Therefore, according to Mitchell, it does not matter what the 1984 rejection form provided because that form was superseded by the 1989 form, which should be treated as an affirmative request for limits equal to the liability limits of the policy.

In support of this conclusion, Mitchell cites *Fishman v. Howard,* 447 So. 2d 513 (La. App. 4th Cir. 1984). However, *Fishman* is not persuasive on this issue. The Louisiana statute at issue in *Fishman* is similar to K.S.A. 40-284 in that it requires uninsured and underinsured motorist coverage equal to the liability limit unless rejected in writing by the insured. However, the form at issue in *Fishman* was a true "coverage selection form" informing the insured of the applicable law and inviting the insured to check one of three boxes. The first box selected uninsured coverage equal to the liability limits. The second box selected uninsured coverage less than the liability limits and offered five new boxes with lower limits. The third box rejected uninsured motorist coverage completely. Under these facts, the Louisiana Court of Appeals found that where the insured himself did not check any box, it was impossible to determine his intent with regard to uninsured motorist coverage and, therefore, it should be presumed that the maximum coverage applied. 447 So. 2d at 516-17.

In contrast, the rejection form at issue in this case is a true rejection form. It is required to be filled out only if the person wishes to reject limits equal to the liability limits of the policy. Thus, the 1989 rejection form which was signed but not filled out cannot be interpreted as an affirmative request for uninsured and underinsured motorist coverage equal to the liability limits. Mitchell's argument in this regard fails.

(4) Mitchell argues that none of the rejection forms signed by UPS were valid because they were not "encompassed within the policy" as required by the Kansas Insurance Commissioner and agreed to by Liberty. In support of this contention, Mitchell cites Kansas Insurance Department Bulletin 1981-20.

Bulletin 1981-20 was issued by the insurance commissioner in 1981 in response to the changes in K.S.A. 40-284. It explained the proposed changes and set out insurance department policies for implementation. As part of implementation, the Bulletin provided:

"It will be necessary for all companies authorized to write motor vehicle liability insurance in Kansas to submit to this Department for approval forms written to afford the coverage required by Senate Bill No. 371. When approved, these forms will be required to be attached to, or encompassed in, all motor vehicle liability policies."

Contrary to the argument of Mitchell, this language does not expressly require that the rejection form itself be "attached to, or encompassed in" the policy. The Bulletin, rather, refers to the policy forms which "afford the coverage" required by K.S.A. 40-284; that is, those endorsement forms that actually state the coverage provided by the policy. An example of this would be the endorsement to the Liberty 1989-92 policy which sets out the limits of uninsured/underinsured motorist coverage. This endorsement would not necessarily include the rejection form which is not a part of the policy itself.

Bulletin 1981-20 is an interpretation by the insurance commissioner with regard to the requirements of K.S.A. 40-284. While construction or interpretation of statutory language is a judicial function, interpretation of a statute is a necessary and inherent function of an agency in its administration or application of that statute. *Dean v. State*, 250 Kan. 417, 422, 826 P.2d 1372, *cert.*

*denied* 504 U.S. 973 (1992). Usually, the legal interpretation of a statute by an administrative agency that is charged by the legislature with the authority to enforce the statute is entitled 'o great judicial deference although when reviewing questions of law, the court may substitute its judgment for that of the agency. 250 Kan. at 422. However, such interpretation is only entitled to deference if it has a rational basis. *National Council on Compensation Ins. v. Todd*, 258 Kan. 535, 539, 905 P.2d 114 (1995).

The commissioner of insurance is vested by statute with the general supervision, control, and regulation of insurers and has the power to make all reasonable rules and regulations necessary to enforce the laws of the state relating to these matters. K.S.A. 40-103. This includes the making of reasonable decisions and interpretations in order to carry out the statutory provisions. However, such rules must be within the authority conferred by the statute and an administrative regulation which goes beyond or conflicts with legislative authorization is void. *Durrett v. Bryan*, 14 Kan. App. 2d 723, 727, 799 P.2d 110 (1990) *rev. denied* 248 Kan. 995 (1991). See *Pork Motel, Corp. v. Kansas Dept. of Health & Environment*, 234 Kan. 374, 378-79, 673 P.2d 1126 (1983).

In the instant case, K.S.A. 40-284(c) sets out the requirements for a valid waiver of excess underinsured coverage and requires a written rejection. If this statute has been interpreted by the commissioner of insurance to require that the waiver be on an approved form and that the form be attached to or encompassed within the policy, its validity is uncertain. While the commissioner of insurance may have the power to require that insurers use certain forms for their written waiver, requiring that the signed waiver be itself attached to any policy adds to the statute an additional requirement without authority. Under K.S.A. 40-284(c), all that is required is that the rejection be in writing. Once a valid rejection is written, the statute has been complied with.

Mitchell contends that the decision of *Larson v. Bath*, 15 Kan. App. 2d 42, 801 P.2d 1331 (1990), provides support for the contention that the rejection form itself must be attached to or encompassed within the policy to be effective. However, *Larson* does not hold that a written rejection must be attached or encompassed

within the policy to be enforceable. In *Larson*, Continental Insurance Company issued a policy with uninsured motorist coverage of $50,000 and provided that the rejection form was attached. However, no form was attached and Continental could not produce a valid rejection form. The Court of Appeals, therefore, held that no valid written rejection of excess coverage existed, not because the rejection form was not attached, but because it was not in existence at all. 15 Kan. App. 2d at 43-45.

We conclude that Bulletin 1981-20 does not require that the rejection form itself be attached to or encompassed within the policy or if it does, this requirement is not valid.

Mitchell also argues that Liberty agreed to abide by the requirements of Bulletin 1981-20. In support, Mitchell cites the letter written by Liberty's staff assistant. Nowhere, however, does Liberty affirmatively promise to attach the rejection form to the policy or "encompass" the form within the policy.

Thus, Mitchell's argument that none of the rejections executed by UPS are valid because they were not attached to or encompassed within the policy is unavailing.

(5) Mitchell's next argument is that the 1984 rejection form was not properly in evidence because Liberty failed to comply with K.S.A. 60-256(e) in presenting it. Mitchell contends that Albert Sharlun's affidavit, including the 1984 policy referenced therein, did not comply with the statute because it does not set forth facts to show that the affiant was competent to testify to the matters asserted and the copy of the rejection form was not certified.

K.S.A. 60-256(e) concerns the forms of affidavits for purposes of summary judgment and states, in pertinent part:

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith."

Mitchell argues that Sharlun had not established that he was competent to testify to the matters or that the policy was a true and correct copy. Mitchell's arguments revolved around the idea that Sharlun was not competent to testify as to whether the amount

written on the policy was filled in by UPS or that the rejection form was encompassed within the 1984 policy. These questions do not go to the admissibility of the affidavit but rather its weight. The affidavit establishes that Sharlun was the Liberty account executive for the UPS account which allowed him to testify that the copy of the 1984 rejection was, in fact, true and correct, and he swore to that effect. The 1984 rejection is duly attached. The trial court did not err in considering it.

(6) Mitchell argues that the 1984 rejection was ineffective because the law at the time did not allow the rejection of underinsured motorist benefits equal to the liability limit of the policy. In support of this contention, Mitchell contends that it was not until July 1, 1988, that the legislature specifically authorized rejection of underinsured motorist excess coverage. This position is without merit.

As was noted above in discussing the statute's history, K.S.A. 40-284 in 1982 allowed rejection of uninsured motorist excess coverage which included underinsured motorist excess coverage. See K.S.A. 40-284 (Ensley 1981). In subsection (c), the statute makes clear that the coverage included in subsection (a) could be rejected. Subsection (a) referred to uninsured/underinsured motorist coverage. K.S.A. 40-284(a), (c) (Ensley 1981). In 1986, the statute was amended and underinsured motorist coverage was given its own subsection (b). See K.S.A. 40-284(b) (Ensley 1986). However, the legislature failed to amend the language in (c) which referred to the rejection of limits provided by (a), but did not refer to (b). This was clearly an oversight and one which the legislature corrected in the 1988 amendment. To hold otherwise, this court would have to find that the legislature: (1) in 1986, decided that allowing rejection of excess uninsured motorist coverage was fine but that rejection of excess underinsured motorist coverage which had been allowed up until that time should be abolished; and (2) in 1988, decided that it had been wrong in 1986 and the ability to reject excess underinsured motorist coverage should be restored. There is no indication in the legislative history that this was the case. Statutes are to be construed to avoid unreasonable results. *KPERS v. Rei-*

*mer & Koger Assocs., Inc.*, 262 Kan. 635, 643, 941 P.2d 1321 (1997).

Since 1981, K.S.A. 40-284 has allowed excess underinsured coverage to be rejected. Mitchell's argument to the contrary is without merit.

(7) Mitchell's final contention with regard to the 1984 rejection is that it should not have been admitted into evidence because the trial court had denied his motion to compel discovery with regard to the 1984 policy. When Liberty filed its motion for summary judgment relying on the 1984 rejection, Mitchell served discovery on Liberty and then filed a motion to compel Liberty to answer the discovery. Among the items sought by Mitchell were the name of the person who filled in the amounts of any rejection form from 1982 to 1995 and a copy of the policies and rejection forms from 1982 to 1995. The thrust of Mitchell's discovery relate to each of his arguments advanced above. In each instance, we have determined that the resolution of this case, consistent with the trial court's decision, involved an interpretation of K.S.A. 40-284(c) (Ensley 1981).

Mitchell sought to establish through additional discovery, with reference to the April 19, 1984 rejection, that it was Liberty not UPS which inserted the lower uninsured/underinsured coverage and that this was done in violation of Liberty's own policy and practice with UPS. There is no dispute in this record that UPS always intended that uninsured/underinsured coverage in Kansas for all its vehicles be set at the lowest limits set by law. The 1984 rejection form was correctly admitted into evidence, expressed the intent of UPS, and was effective in fixing the lower limits of uninsured/underinsured coverage. The primary question involved the prospective effect of the 1984 rejection.

Whether a motion to compel discovery should be granted is within the discretion of the trial court. See *Evans v. Provident Life & Accident Ins. Co.*, 249 Kan. 248, 265, 815 P.2d 550 (1991). In resolving Mitchell's motion to compel discovery, the trial court concluded:

"[A]fter review of the various motions and responses on file, it appears that a single issue remains which may be determinative of the outcome of this case. That

issue is whether the Kansas Uninsured Motorist Insurance Excess Limits Rejection executed by UPS on April 19, 1984, operated prospectively to limit Liberty Mutual's underinsured coverage on the date of the accident.

"Accordingly, the court thinks that plaintiff's motion to compel discovery should be denied at this time and plaintiff should forthwith respond to the summary judgment motion filed by Liberty Mutual."

The resolution of this case involved the interpretation of K.S.A. 40-284(c) (Ensley 1981), a question of law. We conclude that the trial court did not abuse its discretion in denying Mitchell's motion to compel discovery where the only question was legal not factual.

### Interest

The trial court made the following determination with regard to interest:

"The issues before the court are whether plaintiff is entitled to pre-judgment interest on any amounts defendant Shelter owes plaintiff, the amount of that interest, and the time from which it begins to run.

"Having previously found defendant Liberty Mutual was not obligated to plaintiff for underinsured motorist coverage, it is clear from the pleadings and submissions of the parties that defendant Shelter Mutual is liable in the sum of $50,000. This liability arose on October 12, 1999, when the court entered its judgment finding Liberty not liable.

"K.S.A. 16-201 provides that a party is entitled to 10% interest on moneys due and owing 'after it becomes due.' Shelter's obligation became due on that date the court found Liberty did not owe plaintiff. It was not, as argued by the plaintiff, due either as of March of 1995, when the settlement agreement resulting in a partial judgment was entered, nor in August of 1998, when final judgment was rendered in Case No. 93 C 214. An issue remained on those dates and all dates up to October 12, 1999, as to whether Liberty or Shelter should pay proceeds to plaintiff. When the court entered judgment in favor of defendant Liberty, defendant Shelter's obligation became liquidated."

Mitchell contends that the interest should begin on March 29, 1995, which is the date partial judgment was entered against the tortfeasor. Alternately, he contends that even if the interest should commence on the date that final judgment was entered against the tortfeasor, with setoffs, it should be interest on the entire amount of the judgment rather than on the policy limits.

K.S.A. 16-201 provides in pertinent part:

"Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account an ascertaining the balance."

In *Kilner v. State Farm Mut. Auto. Ins. Co.*, 252 Kan. 675, 686, 847 P.2d 1292 (1993), we addressed K.S.A. 16-201's application to uninsured/underinsured motorist claims. The plaintiff in *Kilner* sued his insurer for underinsured motorist coverage. The parties agreed that the plaintiff would be entitled to recover $75,000 if duplicative workers compensation payments were excluded. The insurer, however, sought a setoff for all workers compensation benefits rather than simply duplicative benefits. This court held that only duplicative payments could be set off and the plaintiff was entitled to $75,000. 252 Kan. at 686. However, we ruled that the plaintiff was not entitled to prejudgment interest because the claim was not liquidated. We held that a claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when they become ascertainable by mathematical computation. Because the amount due to the plaintiff was not certain, we held that K.S.A. 16-201 did not apply. 252 Kan. at 686-87.

Shelter argues that the principles in *Kilner* should control in this case. According to Shelter, the amount due did not become fixed and certain until it was determined whether either it or Liberty was liable. The district court agreed.

Mitchell seeks to distinguish *Kilner*, arguing that the amount of damage was not in dispute and the only issue was whether Shelter or Liberty would be liable. He contends this court has long recognized that prejudgment interest is available where an insurer denies coverage under a policy.

The fact that a good faith controversy exists as to whether the defendant is liable for the money does not preclude a grant of prejudgment interest under K.S.A. 16-201. *Crawford v. Prudential Ins. Co., of America*, 245 Kan. 724, 737, 783 P.2d 900 (1989). See *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 883, 953 P.2d 1027 (1998). These cases are distinguished from *Kilner*, where the liability of the insurer was not in dispute but the amount to be paid was. It is true that in *Kilner*, had the insurer prevailed on the

question of law, the insurer would not owe anything, but that would not be because the insurer was not liable but rather because the insurer would have been entitled to set off workers compensation benefits the insured had already received.

The case at hand is more like the situation in *Crawford* and *Hamilton* in that the question is really one of coverage, not amount. There is no question that Shelter is liable for $50,000. Contrary to the trial court's conclusion that interest runs from October 12, 1999, we conclude that interest runs from the date of judgment, March 29, 1995, at which time the amount Shelter was required to pay became fixed. We, therefore, reverse the trial court's determination with regard to the date interest began to accrue.

The next question with regard to interest is the amount on which the interest should run. Mitchell contends that Shelter should be liable for prejudgment and postjudgment interest on the entire amount of the judgment, *i.e.* $840,000, rather than on the amount Shelter is obligated to pay under its policy limits, $50,000. His argument in this regard is based on a supplemental payment provision in his policy with Shelter, wherein Shelter, with regard to the liability provision of the policy states:

"In addition to our limits of liability, we will pay for an insured, under these coverages, the following costs and expenses resulting from such accident:

. . . .

"(3) Interest on any judgment until we pay or offer or deposit in court the amount we owe under these coverages."

This court has held that supplemental provisions such as this one obligate the insurer to pay interest on the entire liability judgment, not just the amount payable under the policy limits. *Glenn v. Fleming*, 247 Kan. 296, 308-310, 799 P.2d 79 (1990).

At the outset, it is important to note that in the absence of K.S.A. 40-284, the supplemental payment provision would not apply to underinsured motorist coverage. The only authority for the awarding of interest on the entire amount is found in the supplemental payment provision and that provision is found only in the liability portion of the policy. Shelter has made no such provision in the underinsured motorist coverage. It has been held that unless specified in the insurance contract, supplemental payment provisions

in the liability coverage of the policy do not apply to the uninsured/ underinsured motorist coverage. *Bryant v. Liberty Mutual Insurance Company*, 407 F.2d 576, 582 (4th Cir. 1969); *United Services Automobile Assn. v. Gambino*, 114 N.C. App. 701, 711, 443 S.E.2d 368 (1994). This is due to the difference between the two types of coverage. See *United Services Automobile Assn.*, 114 N.C. App. at 711.

The purpose of the supplementary payments provision stating that an insurer will pay all interest on the entire amount of the judgment is to protect the insured when the insurer decides to contest liability and a judgment in excess of the policy limits is returned against the insured. 12 Couch on Insurance 3d § 170.43 (1998). See *Stamps v. Consolidated Underwriters*, 208 Kan. 630, 635, 493 P.2d 246 (1972). In *Stamps*, we recognized that where the insurer controls the litigation it is only fair that the insurer pay interest even on that part of the judgment that is in excess of the policy limits because while the insured might desire to pay the excess judgment and stop the running of interest, the insurer could prevent the insured from doing so. 208 Kan. at 635. It would be unfair for the insurer to be allowed, by contesting liability, to run up the interest charges on the entire amount of the judgment and then to be liable only for the interest charges on its coverage limit.

However, the same considerations do not apply to uninsured/ underinsured coverage. The insured in such situations is not the one who would be liable for the excess judgment but rather the person who obtained the judgment. Thus, there is no danger that the insurer could refuse to settle and subject the insured to liability for interest. In such situations, there is no reason to compel the uninsured/underinsured carrier to pay interest on the entire outstanding judgment. *Bryant v. Liberty Mutual*, 407 F.2d at 582. Requiring the insurer to pay interest on the amount it owes under its policy limits adequately reimburses the insured.

As a result, the only way in which Shelter would be liable to pay interest on the entire amount is if K.S.A. 40-284 required that the supplementary payment provision in the liability portion of the policy be included in the underinsured motorist provision of the policy. Mitchell's theory is: (1) K.S.A. 40-284(b) requires that un-

derinsured motorist coverage be equal to liability coverage unless the insured selects less coverage; (2) he did not select less coverage; rather, his underinsured coverage is equal to his liability coverage; (3) the liability coverage includes a supplemental payment provision; and therefore, (4) the supplemental payment provision is statutorily imputed to the underinsured motorist coverage. This is the same reasoning used by the Louisiana Supreme Court in *Martin v. Champion Ins. Co.*, 656 So. 2d 991 (La. 1995). *Martin* held that where no valid waiver of excess coverage had been executed, the uninsured/underinsured coverage to be imputed by statute was the same as liability coverage and that this coverage included all of the supplemental payment provisions of the liability coverage. 656 So. 2d at 994-95. Louisiana is the only state to address this precise question.

While the Louisiana statute at issue in *Martin*, La. Rev .Stat. § 22:1406(D) (West 1995), is similar to K.S.A. 40-284, there are some significant differences. The Louisiana statute provides that absent a valid waiver, uninsured/underinsured coverage must be provided "in not less than the limits of bodily injury liability provided by the policy." Louisiana has interpreted this provision to mandate that in the absence of a valid written rejection or selection of lower limits, uninsured/underinsured coverage is equal to the amount of liability coverage. *Martin*, 656 So. 2d at 994; *Tugwell v. State Farm Ins. Co.*, 609 So. 2d 195, 198 (La. 1992). The Louisiana Supreme Court then interpreted the amount of liability coverage to include the supplemental payment provision. *Martin*, 656 So. 2d at 994.

In contrast, K.S.A. 40-284 does not require that the coverage provided for uninsured/underinsured motorists be equal to that provided for liability, but that the coverage limits be equal. Under the plain language of the Kansas statute, the supplemental payment provisions are not imputed.

Moreover, as noted above, the purpose of the supplemental payment provision is to protect the insured from additional interest charges on the entire judgment where the insurer decides to contest liability. Mitchell is not liable for any judgment, so there is no need of such protection. We reject the holding in *Martin* and find no basis for statutorily imputing the supplemental payment pro-

visions of the liability coverage of the Shelter policy for the uninsured/underinsured provisions of the policy.

We conclude that Shelter is liable only for interest on the amount it was required by law to pay under the policy.

The decision of the trial court is affirmed in part and reversed in part.