No. 120,513

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KAI GRUBER, Personal Representative of the Estate of Christopher S. Gruber, on Behalf
of the Next-of-Kin of Christopher S. Gruber, Deceased,
*Appellee/Cross-appellant*,

v.

THE ESTATE OF RONALD MARSHALL,
*Appellee*,

and

UNITED STATES AIRCRAFT INSURANCE GROUP and UNITED STATES AVIATION
UNDERWRITERS, INC., as Manager of USAIG,
*Appellants/Cross-appellees*.

SYLLABUS BY THE COURT

1.

The law imposes several duties upon insurers. In defending and settling claims against its insured, an insurer of a liability policy owes to the insured the duty to act in good faith and without negligence. A failure to do so will lead to the insurer being held liable for the full amount of the insured's resulting loss, even if that amount exceeds policy limits.

2.

An insurer must conduct itself with that degree of care which would be used by an ordinarily prudent person in the handling of his or her own business. An insurer may consider its own interests, but it must at least equally consider the interests of the insured. This means that the insurer must evaluate the claim without a consideration of the policy

1

limits and as though it alone would be responsible for the entire amount of any judgment rendered on the claim.

3.

The question of liability of the insurer for negligence or bad faith ultimately depends on the circumstances of the case and must be determined by considering various factors.

4.

When an insurer acts honestly and in good faith upon adequate information, it will not be held liable for mere errors of judgment because it failed to prophesy the result. The insurer does not act in bad faith if it honestly believes, and has good cause to believe, that any probable liability will be less than policy limits.

5.

An insurer has a duty to defend the insured including to investigate, communicate with the insured, and negotiate settlement.

6.

When a settlement offer approximates policy limits, there is a conflict of interest between the insured and insurer because the insured wants to avoid the risk of a large judgment by settling within policy limits, but the insurer has little to lose by proceeding to trial because the extent of its liability is fixed.

7.

The insurer thus has a duty to settle if the insurer would start settlement negotiations on its own behalf were its potential liability equal to that of its insured. An insurer must exercise diligence and good faith in its efforts to settle damage claims within the policy limits.

8.

The fiduciary relationship between the insurer and insured imposes a duty on the insurer to make reasonable efforts to negotiate a settlement. The insurer has to begin settlement negotiations regardless of the actions of the injured party. An insurer cannot cure its previous negligence or bad faith by offering the policy limit after commencement of a suit.

9.

There must be a causal link between the insurer's conduct and the excess judgment against the insured. An insurer is not liable for a judgment entered against its insured which exceeds the policy limits unless the plaintiff shows the excess judgment is traceable to the insurer's conduct.

10.

A nonjury judgment that follows an assignment agreement and covenant not to execute may be enforced against an insurer found in bad faith or negligent for refusing to settle if the judgment is reasonable in amount and entered into in good faith.

11.

Interest depends on the date of the judgment and the identification of the amount of the judgement. Under K.S.A. 16-201, creditors shall be allowed to receive interest at the rate of 10 percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due.

12.

A good-faith controversy about the liability for a liquidated claim does not preclude the grant of prejudgment interest. A good-faith controversy concerning the existence of insurance coverage does not preclude the grant of prejudgment interest when

3

the amount in controversy is not seriously disputed. Thus, a claim is liquidated if the controversy is one of coverage, not amount.

13.

An award of reasonable attorney fees is allowed under K.S.A. 40-908 if the judgment is rendered against any insurance company on any policy given to insure any property in this state against loss by fire, tornado, lightning, or hail.

Appeal from Riley District Court; GRANT D. BANNISTER, judge. Opinion filed January 22, 2021. Affirmed in part, reversed in part, and remanded with directions.

*Lynn W. Hursh*, of Armstrong Teasdale LLP, of Kansas City, Missouri, for appellants/cross-appellees United States Aircraft Insurance Group and United States Aviation Underwriters, Inc.

*Lynn R. Johnson* and *Daniel A. Singer*, of Shamberg, Johnson & Bergman Chartered, of Kansas City, Missouri, *Michael W. Blanton*, of Blanton Law Firm, of Evergreen, Colorado, and *William J. Bahr*, of Arthur-Green, LLP, of Manhattan, for appellee/cross-appellant.

No appearance by appellee the Estate of Ronald Marshall.

Before ARNOLD-BURGER, C.J., HILL and GARDNER, JJ.

HILL, J.: Flying from Oklahoma, two friends died when their plane crashed before they made it back to Manhattan, Kansas. Claiming pilot negligence, the estate of the passenger sued the pilot's estate. The two estates settled, and, by agreement, the court entered judgment against the pilot's estate in excess of the insurance coverage. When the passenger's estate garnished the pilot's insurance carrier, it recovered over $11 million. The insurance carrier brings this appeal.

We deal with two questions. We must decide whether the district court was correct when it held that the insurance carrier breached its insurance policy with the insured. And

then we must decide whether the garnishment of the pilot's insurance carrier was legal. After that, we address questions about attorney fees and prejudgment interest that are raised in the cross-appeal.

*The controversy begins with a tragic accident.*

In April 2013, the airplane Ronald Marshall piloted crashed, killing Marshall and his passenger, Christopher Gruber. Marshall, a retired surgeon, had specialized in obstetrics and gynecology in Manhattan. Marshall had often flown his plane around the state to deliver babies and perform surgeries if there was an emergency. At his death, he was married to Judy Marshall and had two children.

When Gruber died, he was 40, married to Kai Gruber, and they had three young children. He worked at the Kansas State University Foundation as a development officer for the College of Veterinary Medicine. He earned about $95,000 a year. Gruber knew Marshall through his involvement with Future Farmers of America in high school. High school students would on occasion stay at the Marshalls' house during FFA conventions. Gruber and Marshall had remained friends after Gruber's high school graduation.

Marshall was insured by the United States Aircraft Insurance Group. We will call the insurer USAIG. Marshall and his son, Rhen, were named insureds on the policy. Along with general liability coverage, Marshall had a "voluntary settlement coverage" rider as a part of a preferred pilot coverage expansion under which USAIG could, upon request of the insured, have to pay a passenger's estate the policy limit of $100,000, regardless of fault, in exchange for a release of liability.

USAIG offered preferred pilot coverage expansion to select pilots who were actively keeping up with their training. This coverage was intended to provide a way for

an insured to dispose of a liability claim without an uncomfortable discussion of fault, especially when a deceased passenger was a friend or a relative.

USAIG did not offer the Gruber Estate that $100,000 until more than a year after the crash. By that time, the Gruber Estate refused the offer. After the National Transportation Safety Board concluded the cause of the crash was a loss of control by Marshall for reasons that could not be determined, the Gruber Estate filed a wrongful death lawsuit against the Marshall Estate.

Because USAIG failed to timely offer the Gruber Estate this compensation, it now seeks much more than $100,000 from USAIG. The heart of this action is the Gruber Estate's claim that USAIG was negligent for failing to make a policy limits offer within a reasonable time.

The Marshall Estate believed it had a breach of contract claim against USAIG for failure to timely offer the policy limit under its voluntary settlement coverage. The two Estates entered into an assignment agreement and covenant not to execute. The Marshall Estate agreed to assign to the Gruber Estate its contract claim against USAIG and to admit fault and causation on Gruber's wrongful death claim. In return, the Gruber Estate agreed not to collect from the Marshall Estate any judgment entered against the Marshall Estate. The Gruber Estate presented its case to the trial court that Marshall was solely at fault for the crash and asserted damages over $11 million. The trial court found for the Gruber Estate and entered judgment against the Marshall Estate for the amount sought. USAIG was not a party to that action, nor did it participate in the trial.

Indeed, the trial court found that USAIG both negligently and in bad faith breached its insurance contract with the Marshall Estate over the voluntary settlement coverage. The court found that this breach of contract caused the entry of an excess judgment against the Marshall Estate and therefore USAIG was liable for the entire $11

6

million judgment. Rather than have to pay $100,000—the policy limit—USAIG was ordered to pay $11 million.

USAIG appeals, attacking the judgment on three fronts. First, it claims the court's finding that it negligently and in bad faith breached the voluntary settlement provision of the insurance contract is not supported by substantial competent evidence. Second, in its view, the court erred when it held that USAIG's claimed breach of the insurance contract caused the excess judgment against Marshall's Estate. Finally, the court erred when it held that Gruber's Estate had met its burden of showing the assignment agreement between the two Estates was entered into in good faith and the judgment was reasonable.

The Gruber Estate, in a cross-appeal, contends the district court erred by failing to award prejudgment interest on its claim and when it failed to award attorney fees as allowed by law.

*There are unique rules on insurance companies and their insureds.*

Before we examine the record for any evidence supporting the court's findings, we review the law concerning insurers and their duties. It provides a context to understand the significance of the court's holding.

The law imposes several duties upon insurers. In defending and settling claims against its insured, an insurer of a liability policy owes to the insured the duty to act in good faith and without negligence. A failure to do so will lead to the insurer being held liable for the full amount of the insured's resulting loss, even if that amount exceeds policy limits. *Bollinger v. Nuss*, 202 Kan. 326, Syl. ¶ 1, 449 P.2d 502 (1969).

The insurer must conduct itself with that degree of care which would be used by an ordinarily prudent person in the handling of his or her own business. An insurer may

consider its own interests, but it must at least equally consider the interests of the insured. This means that the insurer must evaluate the claim without a consideration of the policy limits and as though it alone would be responsible for the entire amount of any judgment rendered on the claim. *Bollinger*, 202 Kan. 326, Syl. ¶ 4.

The question of liability of the insurer for negligence or bad faith ultimately depends on the circumstances of the case and must be determined by considering various factors. *Bollinger*, 202 Kan. 326, Syl. ¶ 5. Those factors include:

- the strength of the claimant's case on the issues of liability and damages;
- attempts by the insurer to induce the insured to contribute to a settlement;
- failure of the insurer to properly investigate;
- the insurer's rejection of the advice of its own attorney or agent;
- failure of the insurer to inform the insured of a compromise offer;
- the amount of financial risk which each party is exposed;
- the fault of the insured in inducing the insurer's rejection of a compromise offer by misleading it on the facts; and
- any other factors tending to establish or negate bad faith.

*Bollinger*, 202 Kan. at 338.

When an insurer acts honestly and in good faith upon adequate information, it will not be held liable for mere errors of judgment because it failed to prophesy the result. The insurer does not act in bad faith if it honestly believes, and has good cause to believe, that any probable liability will be less than policy limits. *Bollinger*, 202 Kan. 326, Syl. ¶ 8.

The insurer has a duty to defend the insured including to investigate, communicate with the insured, and negotiate settlement. See *Geer v. Eby*, 309 Kan. 182, 193, 432 P.3d 1001 (2019); *Covill v. Phillips*, 452 F. Supp. 224, 226 (D. Kan. 1978).

When a settlement offer approximates policy limits, there is a conflict of interest between the insured and insurer because the insured wants to avoid the risk of a large judgment by settling within policy limits, but the insurer has little to lose by proceeding to trial because the extent of its liability is fixed. *Bollinger*, 202 Kan. at 336.

The insurer thus has a duty to settle if the insurer would start settlement negotiations on its own behalf were its potential liability equal to that of its insured. An insurer must exercise diligence and good faith in its efforts to settle damage claims within the policy limits. *Farmers Ins. Exchange v. Schropp*, 222 Kan. 612, Syl. ¶¶ 4-5, 567 P.2d 1359 (1977). The fiduciary relationship between the insurer and insured imposes a duty on the insurer to make reasonable efforts to negotiate a settlement. The insurer has to begin settlement negotiations regardless of the actions of the injured party. *Rector v. Husted*, 214 Kan. 230, 241-42, 519 P.2d 634 (1974); *Smith v. Blackwell*, 14 Kan. App. 2d 158, 163, 791 P.2d 1343 (1989). An insurer cannot cure its previous negligence or bad faith by offering the policy limit after commencement of a suit. *Blackwell*, 14 Kan. App. 2d at 163-64.

But an insurer need not accept a premature settlement offer without having adequate information when investigations are ongoing. See *Glenn v. Fleming*, 247 Kan. 296, 306-07, 799 P.2d 79 (1990). In *Glenn*, the insurer did not act in bad faith by refusing to accept the plaintiff's early policy-limits settlement offer when liability and damages were disputed; investigations were ongoing; the early investigative reports revealed the plaintiff was entirely at fault; the plaintiff's medical records were not sent to the insurer; the plaintiff and insurer were cooperating; and the offer was unreasonable because it was premature, had conditions attached to it, and was only open for two weeks. 247 Kan. at 306-07.

In contrast, in *Rector*, where liability of the insured was unquestioned, the plaintiff sought damages of $25,000, and the insurer anticipated the verdict could be as high as

$7,500. The policy limit was $10,000, but the insurer only offered to settle with the plaintiff for $1,000 and proceeded to trial. The insurer acted negligently and in bad faith by refusing to make a reasonable attempt to settle within policy limits. 214 Kan. at 237, 241-42.

To sum up, the law reflects the realities of the relationship between an insured and an insurer. Their insurance contract apportions risk and creates a dynamic tension between the two. On one side, the possibility of being found liable for any resulting financial losses because of an insured's negligence, makes an insured vulnerable. On the other side, an insurer is protected by the terms and limits of their insurance policy. And because an insured is exposed to loss, an insurer must act diligently and in good faith. The insurer must keep the interests of the insured in mind at all times. Thus, the law commands that an insurer who fails to act reasonably on behalf of the insured will be responsible for the losses instead of the insured.

*This time line helps in understanding what the court decided and why.*

We begin right after the plane went down. On April 8, 2013—the day after the crash—Robert Houck, a claims handler for USAIG, went to the crash site, took photographs, and talked to the National Transportation Safety Board investigator. He learned that the plane's take off from the Tulsa airport was normal. It reached an altitude of 4,000 feet or above and it was cleared to climb to 6,000 feet. It was on its intended course, the weather was good, there were no reported problems or issues, but then the plane began a very steep descent and crashed. The belly pan had separated from the aircraft and was a mile and a half from the crash site.

On April 9, 2013, USAIG set up a reserve of $175,000 for a liability claim by the Gruber Estate to cover the policy limit of $100,000 and legal expenses.

On April 11, 2013, Houck contacted Rhen Marshall.

Between April 10-16, 2013, Kai Gruber hired attorneys Bill Bahr and Doug Bradley to help with possible claims.

On April 16, 2013, the NTSB published its preliminary report. The report stated that communications with the tower were normal, the plane was cleared to climb to 6,000 feet, there were no emergency or distress calls from the plane, and the plane reached 4,100 feet before a descending, right turn was observed on the radar.

During the period of April 24-30, 2013, Houck spoke with Bahr. Bahr then followed up the conversation with an e-mail to Houck asking for coverage information and sent a copy of the e-mail to Kai and attorney Lynn Johnson. Houck e-mailed Bahr explaining that a $5,000 medical coverage benefit was available to pay Gruber's funeral expenses and they could discuss the liability limit once the Letters Testamentary had been processed.

About the same time, Judy Marshall met with a friend who was an attorney—Jim Morrison. Morrison saw the name Lynn Johnson copied on an e-mail about the crash and told Judy that she needed to have her "ducks in a row" because Johnson's law firm handled litigation for cases like this. Judy relayed the conversation to Rhen and Rhen told Houck. Rhen expressed concern to Houck that Kai had hired a well-known plaintiff's attorney and a claim would be made against the Marshall Estate in excess of the policy limit. Houck assured Rhen that he would hire an attorney for them if they needed one. Houck told Rhen he would have a defense for them if they were sued. Houck told Rhen not to worry, that USAIG would protect his interest. During this period, Houck spoke with Rhen several times about the insurance coverage.

Also, during April-May 2013, Houck decided that Marshall was well qualified to fly his plane. Marshall held a commercial pilot certificate and was a member of the Mooney Aircraft Pilots Association. He went to training seminars every year. He had been flying almost 30 years and had reported nearly 4,000 total flight hours and 150 hours in the preceding six months.

Sometime between April-May 2013, Houck determined that the Gruber Estate could make a claim in excess of $100,000 based on Gruber's young age, family, and employment. If the policy limit had been $1,000,000, Houck would have recommended a reserve of $1,000,000 for the claim. Houck also determined that Marshall had substantial assets and decided that he needed "to try to settle this claim at the first reasonable opportunity." At this point, Houck had authority to pay the $100,000 policy limit.

On May 23, 2013, Doug Bradley, an attorney representing Kai, sent Houck a letter requesting preservation of the aircraft wreckage "in anticipation of litigation." The letter did not assert that Marshall was at fault for the crash.

Then, on May 24, 2013, Houck e-mailed Kai's attorney a copy of Marshall's insurance policy. Kai's attorney e-mailed Gruber's funeral bill to Houck and stated that he would "be in touch at a later date to discuss the liability coverage."

In June 2013, USAIG paid $5,000 to the funeral home. The plane crash had also damaged two homes and a vehicle. The homeowners made claims for insurance proceeds and USAIG paid those claims.

On June 18, 2013, Kerry Porter, Houck's supervisor, attended a wreckage inspection on behalf of USAIG. Bradley attended on behalf of the Gruber Estate. Bradley recalled discussing Marshall's liability for the crash with Porter at the inspection site.

According to Bradley, he told Porter that in general, some of the fault is apportioned to a pilot for a plane crash, and $100,000 was inadequate to cover a death.

Bradley alleged he also told Porter that his law firm was considering other potential parties who may have contributed to the fault, but the pilot "was going to get fault in this case." Bradley recalled that Porter agreed that $100,000 was inadequate and the two of them discussed the insurance industry and liability limits in general. Bradley felt that Porter understood the Gruber Estate was pursuing a claim against the Marshall Estate.

For his part, Porter recalled that he talked to Bradley about the limits found in aviation insurance policies in general. But according to Porter, Bradley did not mention the possibility of a claim against the Marshall Estate. Later, Porter reported to Houck that the Gruber Estate attorneys were looking at a repair facility as potentially responsible for the crash. The plane had a "gear-up landing" in 2010 and underwent repair work.

On June 24, 2013, Houck prepared an internal report: "Depending on the theory B[r]adley produces, we may intervene in his lawsuit."

On September 4, 2013, Judy, Rhen, and Houck spoke. Judy and Rhen were concerned about a lawsuit from Kai. Rhen later stated that he would have requested payment of the voluntary settlement during this conversation if he had known he had that right.

In January 2014, USAIG paid Rhen $130,000 for the loss of the aircraft.

On April 30, 2014, Bradley called Houck to request repair records. They discussed the voluntary settlement coverage. Bradley followed up with an e-mail to Houck

13

requesting documents and photographs relating to the gear-up landing that led to repairs to the aircraft by Deason Aircraft Services in 2011.

Then, on May 2, 2014, Houck asked Bradley if they wanted USAIG to offer the voluntary settlement. Once it was offered, they had 90 days to accept it. Bradley confirmed that "the $100,000 policy is available to us when we request it to be offered."

May 8, 2014, Houck e-mailed his superior, Clark Howard, asking if he should share the documents Bradley requested relating to the gear-up landing. The e-mail is revealing:

> "Attorney wants a copy of . . . hull file from 2011 gear-up/failure (?) where Deason Aircraft Services (not insured with us) repaired the damage. The aircraft had 289 +/- hours and an annual elsewhere since Deason repaired it under the previous hull file. NTSB is talking wing/spar failure but part of the one-piece belly pan departed the aircraft prior to flight.
> "[Attorney] is searching for theories as we only have . . . $100K per pa[ssenger]."

Then in June 2014, USAIG hired attorney William Yocum to represent the interests of the Marshall Estate. Houck told Yocum he anticipated settlement. Before June 2014, the Marshall Estate was not represented by counsel.

On July 23, 2014, the NTSB issued its final report. The report concluded the probable cause of the crash was the "pilot's loss of control of the airplane for reasons that could not be determined because an examination of the airplane did not find an abnormality that would have precluded normal operations." The report stated that because of the location of the airplane's belly panel 1.4 miles from the crash site, it likely separated during the high-speed descent.

On July 31, 2014, Bradley e-mailed Yocum explaining that he was "investigating whether there was a mechanical failure in one of the flight instruments (attitude indicator and vacuum pump that runs the gyro)" and requested maintenance records for the aircraft.

*At this point the Gruber Estate sues the Marshall Estate.*

Finally, on December 29, 2014, the Gruber Estate filed a wrongful death lawsuit against the Marshall Estate and two aircraft repair companies—Deason and Western Skyways, Inc. The complaint alleged that Marshall was negligent when he lost control of the airplane resulting in the crash. The complaint also alleged that Deason and Western Skyways were negligent by failing to replace the vacuum pump engine component on the aircraft in 2011 after the gear-up landing.

Then in March 2015, the Marshall Estate decided it had a breach of contract claim against USAIG for negligent and bad-faith failure to timely offer the policy limit under its voluntary settlement coverage.

Finally, on May 29, 2015, after learning of this potential claim, USAIG formally offered the $100,000 to the Gruber Estate. Yocum had already spoken to Rhen about the offer, and Rhen agreed.

Then, on June 29, 2015, Lynn Johnson responded on behalf of the Gruber Estate that the offer had come "too late."

On November 10, 2015, Deason, in an answer to interrogatories, stated it had replaced the vacuum pump on the aircraft in June 2011, thus undercutting the premise of the lawsuit against Deason.

On November 25, 2015, the Gruber Estate proposed a "*Glenn v. Fleming* agreement" to the Marshall Estate—an assignment agreement and covenant not to execute.

Then in December 2015, Yocum advised USAIG of the proposed assignment agreement. USAIG directed Yocum to continue to represent the Marshall Estate.

In January 2016, Clark Howard assumed responsibility over this matter for USAIG. USAIG then hired Joe McDonough to represent its interests. McDonough asked Yocum to update him with "new events."

During February 2016, Yocum provided McDonough copies of its file, but specifically excluded documents relating to the assignment agreement because of the "potentially adverse relationship" between the Marshall Estate and USAIG on that matter.

In April 2016, Deason and the Gruber Estate settled. The two aircraft repair companies were dismissed from the suit, leaving the Marshall Estate as the sole defendant.

Later in April 2016, the Gruber and Marshall Estates entered into an assignment agreement. The Marshall Estate agreed to assign the Gruber Estate its claim against USAIG and to "confess judgment" on the issues of fault and causation in Gruber's wrongful death action.

In return, the Gruber Estate agreed not to collect from the Marshall Estate any judgment entered against the Marshall Estate. Under the agreement, damages would be determined by the trial court after hearing evidence. The court approved the assignment agreement. In their trial stipulations, the Estates agreed that despite the Marshall Estate's

16

admittance to fault and causation, the trial court should determine the issues of negligence, fault, and causation based on the evidence presented at trial.

On May 27, 2016, Yocum sent a copy of the assignment agreement to USAIG.

*The court decides liability in an uncontested hearing.*

On July 20, 2016, the Gruber Estate presented its case to the trial court that Marshall was solely at fault for the crash and asserted damages of $11,588,548.89. Colin Sommer, an accident investigator and reconstructionist, testified that he ruled out all other possible ways the aircraft could have crashed and concluded that Marshall was negligent in that he "lost control of the airplane due to spatial disorientation."

A forensic economist testified about the economic loss suffered by Kai and her children. The Marshall Estate did not cross-examine any witnesses, challenge any evidence presented, present any evidence of its own, or make any arguments. The trial court found for the Gruber Estate and entered judgment against the Marshall Estate for the amount sought. The court found that, based on the evidence presented at trial, Marshall was negligent; his negligence was a direct cause of the crash; and he was 100 percent at fault.

USAIG was not a party to that action and was not given notice of the trial.

Finally, in August 2016, the Gruber Estate filed this garnishment action against USAIG seeking to recover the $11 million judgment from USAIG.

*We turn to the district court's finding that USAIG negligently and in bad faith breached the insurance contract.*

The district court ruled that the insurance contract imposed an affirmative duty on USAIG to timely offer the $100,000 voluntary settlement coverage to the Gruber Estate upon the Marshall Estate's request. The district court also ruled that USAIG had an obligation to ensure that its insureds had a reasonable understanding of the voluntary settlement coverage. The court held that USAIG failed to timely satisfy either obligation.

In this appeal, USAIG seeks reversal of this point by presenting two arguments. First, USAIG contends that it did not breach the insurance contract because none of the three conditions precedent to the voluntary settlement coverage were met. Second, USAIG contends that as much as it had a duty to begin settlement discussions, it satisfied that duty.

*We examine the conditions precedent.*

The voluntary settlement coverage in USAIG's policy has two conditions precedent to its obligation to *offer* the settlement: (1) a request by a policyholder (2) within one year of the occurrence. The provision states:

> "We will offer on your behalf and at the request of the 'Policyholder,' a sum to or for each passenger who receives certain injuries while riding in a covered aircraft with your permission. . . . It is a requirement of this offer that we receive a complete and final release of all liability for the injuries covered under your '**Combined Liability Coverage for bodily injury and property damage**.' We will not be obligated to make a voluntary settlement offer to pay a claim to, or make a settlement with, a passenger or his or her estate, if you do not request us to do so within one (1) year of the occurrence involving an aircraft covered under this section."

18

The provision also states that a requirement of the offer will be that the passenger provide a release of liability. That is a condition precedent to USAIG's duty to *pay* the settlement, not to offer it. It would be nonsensical for the passenger to provide a release of liability before a settlement was even offered.

Both parties concede that Houck, on behalf of USAIG, had discussions with the Marshalls about the voluntary settlement coverage between April and September 2013—within the one-year time limit. The point of contention is whether the discussions amounted to a "request" that USAIG offer the voluntary settlement. Thus, the only condition precedent at issue is the first one.

The district court found that Rhen made such a request by September 2013, and there is substantial competent evidence to support that finding. Houck's testimony that he ultimately had authority from Rhen to offer the voluntary settlement but Rhen did not "request" the voluntary settlement, was confusing, contradictory, and ultimately unavailing. Houck said he was waiting for Rhen to request the voluntary settlement—he needed Rhen's consent.

But Houck also said he offered the settlement in late April 2014, based on the authority Rhen gave him in 2013. Houck testified he talked to Rhen about authorizing the voluntary settlement and he knew Rhen would authorize the voluntary settlement. Houck knew Rhen was concerned about a lawsuit in excess of policy limits. Houck testified that Rhen "agreed that if we could pay the voluntary settlement . . . he would request us to ask for it." And Houck testified that Rhen "said that he would authorize it if that was available or if that became something to do." As the district court stated, "There is no distinction between an insured expressing desire and authority to resolve a claim and an insured saying magic words such as 'I request' or 'I direct' payment." The voluntary settlement coverage *was* available and USAIG *could* have paid it.

19

*USAIG acted negligently and in bad faith because it failed to offer the voluntary settlement as required by its policy, not because of a general duty to settle.*

USAIG contends that as much as it had a duty to begin settlement discussions, it satisfied that duty because it made an offer 13 months after the plane crash when the Gruber Estate was still investigating. At that point, the Gruber Estate had made no claim against the Marshall Estate, nor were there any allegations of pilot error. And the Gruber Estate had not suggested that it was willing to settle. Further, the NTSB was still investigating, and any liability remained unclear.

But these arguments do not undercut the reason why the district found USAIG negligent and in bad faith. There were two theories of how USAIG was negligent or acted in bad faith. Under the first:

- USAIG knew within a few months of the crash that the potential liability of the Marshall Estate far exceeded the policy limits of its insurance policy;
- USAIG knew the Marshall Estate had substantial assets to protect;
- USAIG knew Marshall could likely be apportioned some amount of fault under comparative fault principles;
- even though the fault could be minimal, the exposure could be large;
- Gruber was not at fault;
- USAIG knew it needed to offer a settlement at the first reasonable opportunity;
- USAIG knew the Marshalls would authorize a settlement within the policy limits;
- USAIG knew that the Marshalls were concerned about a lawsuit in excess of the policy limits;
- USAIG did not hire counsel for the Marshalls for more than a year; and
- waiting 13 months to begin settlement discussions was unreasonable.

Certain facts support this theory. There were long periods of undocumented activity by USAIG within that 13 months. USAIG failed to investigate a cause of the crash other than pilot error. USAIG did not hire an accident reconstructionist. USAIG did not hire an economist to evaluate damages. USAIG did not hire counsel for the Marshall Estate within that time frame even though the Gruber Estate had hired an experienced firm, and USAIG knew it needed to offer the voluntary settlement at the first reasonable opportunity. But investigations were ongoing, the NTSB had not yet issued its final report, the cause of the crash and liability of the pilot were unsure, and a lawsuit had not yet been filed. Fault was critical and unsure. Thus, the district court did not find that USAIG acted negligently or in bad faith for failing to begin settlement discussions under this theory.

Under the second theory—the theory followed by the court—the voluntary settlement coverage imposed a duty on USAIG over and above that of general liability coverage. This theory is simpler than the first:

- USAIG had to offer the voluntary settlement upon request by the Marshalls;
- USAIG knew by September 2013 that the Marshalls wanted the voluntary settlement to be offered and the authority given by the Marshalls to offer the voluntary settlement amounted to a request;
- or, if there was no request, it was only because USAIG misled the Marshalls into believing that USAIG needed to request authorization from them; Rhen would have requested the settlement if not misled;
- the voluntary settlement coverage was part of a preferred pilot coverage expansion given to some select pilots;
- the voluntary settlement coverage was not premised on any proof of liability; and
- USAIG unreasonably delayed offering the voluntary settlement until late April 2014.

21

Under this theory, the delay was unreasonable because USAIG had an express obligation under its policy to offer the voluntary settlement upon the policyholder's request. The policy says, "*We will offer on your behalf* and at the request of the 'Policyholder" the $100,000 voluntary settlement. (Emphasis added.)

This provision created a conflict of interest between USAIG and the Marshall Estate because USAIG's maximum liability was fixed at $100,000. By delaying the offer, USAIG put its own interests above the Marshall Estate's interests. USAIG's liability was fixed at $100,000 either way, but the Marshall Estate's potential liability was much greater. USAIG admitted that it knew it needed to try to settle at the first reasonable opportunity. Yet USAIG was fixated on its belief that Marshall was not at fault for the plane crash. But fault was irrelevant to USAIG's duty to offer a settlement under the voluntary settlement coverage. By focusing on fault and delaying the voluntary settlement offer, USAIG did not exercise diligence and good faith in its efforts to settle using the voluntary settlement coverage.

USAIG contends that the district court somehow imposed on it an obligation to make an offer within one year, which was not required by the policy.

But the court did not impose a one-year limit on USAIG. The court was merely following the insurance policy. The court pointed out that the voluntary settlement provision had a one-year expiration date. If the insured had not requested the insurer pay the voluntary settlement within a year after the accident, the coverage expired. The insurance policy is straightforward:

> "We will not be obligated to make a voluntary settlement offer to pay a claim to, or make a settlement with, a passenger or his or her estate, if you do not request us to do so within one (1) year of the occurrence involving an aircraft covered under this section."

22

But the district court did not base its finding of negligence and bad faith on this time limit. The court found that USAIG had authorization from the Marshalls to offer the voluntary settlement by September 2013, yet unreasonably delayed until either late April 2014 or early May 2014. By that time, Kai was no longer willing to accept a policy limits settlement.

The record supports the district court's findings of negligence and bad faith. It shows that USAIG waited to offer the voluntary settlement until after its expiration point, even though Rhen had authorized its offer in September 2013.

*USAIG's breach of the insurance contract led to the excess judgment against the Marshall Estate.*

Under this issue, USAIG contends the only cause of the judgment against the Marshall Estate was the Estate's decision to consent to the judgment. USAIG claims that the Gruber Estate invented a one-year deadline to manufacture a claim for bad faith. It argues that the excess judgment cannot depend on Kai's change of mind regarding settlement, nor can it stem from hindsight. Because there was never a settlement offer by the Gruber Estate, USAIG cannot be held responsible for the excess judgment.

Because the duty of good faith arises from the contract itself, general principles of contract law apply, including the element of causation. *Sours v. Russel*, 25 Kan. App. 2d 620, 622, 967 P.2d 348 (1998). "'[T]here must be a causal link between the insurer's conduct and the excess judgment against the insured.' [Citations omitted.]" *Roberts v. Printup*, 595 F.3d 1181, 1187 (10th Cir. 2010). An insurer is not liable for a judgment entered against its insured which exceeds the policy limits unless the plaintiff shows the excess judgment is traceable to the insurer's conduct. *Sours*, 25 Kan. App. 2d at 625; *Winchell, Inc. v. Norris*, 6 Kan. App. 2d 725, Syl. ¶ 2, 633 P.2d 1174 (1981). An insurer's rejection of a claimant's settlement offer is not the only circumstance that can establish a

23

causal link between an insurer's conduct and an excess judgment against the insured. See *Hawkins v. Dennis*, 258 Kan. 329, 347, 905 P.2d 678 (1995).

The garnishment court found that Kai would have accepted a policy limits settlement offer within the first year after the crash. There is substantial competent evidence to support this finding and no evidence to dispute it. But the issue is whether Kai's arbitrary change of mind was the legal cause of excess judgment against the Marshall Estate rather than USAIG's failure to timely offer the voluntary settlement.

Courts have held that the insurer is not the legal cause of an excess judgment when the claimant rejects a policy-limits settlement offer that he or she would have accepted earlier, solely to manufacture a bad-faith claim. In *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657 (10th Cir. 2007), the plaintiff in a tort suit against the insured demanded a policy-limits settlement shortly after an automobile accident when liability and causation were "vigorously" disputed. The plaintiff did not timely provide the insurer relevant medical records or provide medical releases. The plaintiff then withdrew his settlement offer. Later, the plaintiff rejected the insurer's policy-limits settlement offer just because the plaintiff hoped to recover a much larger award by pursing a bad-faith claim. Plaintiff's counsel admitted that he had a bad-faith claim in mind from the beginning and rejected the settlement offer as part of a strategy to establish a bad-faith claim. As a result, the court held the insurer was not liable where the insurer eventually offered to settle for policy limits, but the plaintiff rejected the offer to manufacture a lawsuit for bad faith. 483 F.3d at 674.

The *Wade* court was concerned about plaintiffs "setting up" an insurer for a bad-faith claim by inventing an arbitrary deadline for a settlement offer while holding back information the insurer needed to appraise the offer. A bad-faith claim is supposed to be a shield for insureds, not a sword for claimants. 483 F.3d at 669.

24

"'Permitting an injured plaintiff's chosen timetable for settlement to govern the bad-faith inquiry would promote the customary manufacturing of bad-faith claims, especially in cases where an insured of meager means is covered by a policy of insurance which could finance only a fraction of the damages.' [Citation omitted.]" 483 F.3d at 670.

The plaintiff should be able to show why an offer that would have been good one day is not acceptable a short time later. See *Wade*, 483 F.3d at 673. "There are a number of reasons why an insurer's delay in attempting to settle a claim might set up a natural and continuous sequence of events that causes a claimant to reject a policy-limits settlement offer that he would have accepted earlier." 483 F.3d at 674. For example, claimants have more incentive to negotiate a settlement before undertaking the time and expense of preparing for a trial. 483 F.3d at 674. "But if a claimant arbitrarily withdraws an initial settlement offer and later rejects an identical proposal from the insurer, the claimant's conduct is the legal cause of the failure to settle." 483 F.3d at 674.

Another case in federal court helps explain this issue. In *Kemp v. Hudgins*, 133 F. Supp. 3d 1271, 1295-96 (D. Kan. 2015), the court held that no reasonable jury could conclude that the insurer's conduct caused the excess judgment because the insurer repeatedly offered its policy limits and the claimant's sole motivation in rejecting the offers was to manufacture a bad-faith claim. The evidence showed that the claimant did not believe the insurer's policy limits sufficiently covered his claim and the claimant's attorney would be paid only if he recovered more than policy limits under the attorney's fee agreement.

But the causal connection is not always broken just because the claimant rejects a policy settlement offer that he or she would have accepted earlier. In *Roberts*, the plaintiff offered to settle for policy limits but put a 10-day deadline on the offer because the statute of limitations for filing her claim was set to expire. She also filed a lawsuit but instructed her attorney to dismiss the lawsuit if the insurer accepted her offer before the

statute of limitations expired. She and her attorney had an agreement that if they settled before the statute of limitations expired, she would not owe attorney fees on her recovery. The insurer mistakenly sent the settlement offer letter to the wrong department. The claims department did not receive the letter for another three weeks. The insurer then offered to pay the policy limit. But plaintiff declined the offer. The court distinguished *Wade*, noting that the causal connection between an insurer's wrongful act and the insured's injury is not broken by an intervening cause that is reasonably foreseeable. 595 F.3d at 1188-89.

Unlike in *Wade*, the plaintiff imposed no arbitrary deadline, nor did she withhold information necessary for the insurer to appraise the case. Considering the statute of limitations, plaintiff reasonably set a 10-day deadline. The insurer's delay exposed the plaintiff to costs and attorney fees and an unwanted lawsuit against a family member. The insurer's negligence in its failure to implement a system to handle time-sensitive offers caused the excess judgment. 595 F.3d at 1190.

So we return to the fundamental question. Was Kai's arbitrary change of mind and the Gruber Estate's refusal to accept the voluntary settlement in late April 2014 the legal cause of the excess judgment? We are not persuaded that it was the cause.

Here, most of the concerns from *Wade* are not present. The bad-faith claim was not manufactured. It depended on the voluntary settlement coverage, which is unique to this case. The Gruber Estate did not make an early settlement offer with an arbitrary expiration date while withholding information from USAIG. The e-mail communications show that the parties were cooperating and sharing information. There was no testimony suggesting that the spring 2014 settlement offer was rejected to set up a bad-faith claim. Kai testified that she changed her mind because of a conversation with her mother. The insured also was not of "meager means"; the Grubers could have recovered against the personal assets of the Marshalls rather than create a bad-faith claim.

If causation can depend on a claimant's change of mind without more, then claimants do have an incentive to withhold settlement offers as part of a strategy to make an insurer pay for an excess judgment. But there was just no evidence that this is what occurred here. Charles Miller testified that "a claim payment delayed is a claim payment denied." If the insurance company does not pay a claim timely, it risks not protecting the insured later down the line. USAIG's delay in making an offer was unreasonable and caused the excess judgment under the facts here.

And the act assigning the claim to the Gruber Estate did not break the causal connection between USAIG's negligence and bad faith and the judgment against the Marshall Estate. See *Blann v. Rogers*, 22 F. Supp. 3d 1169, 1183 (D. Kan. 2014), *amended by Blann v. Rogers*, No. 11-2711-CM, 2014 WL 6895592 (D. Kan. 2014) (unpublished opinion).

*The court did not err by holding that the judgment against the Marshall Estate could be enforced against the insurer, USAIG.*

Courts in Kansas do not automatically enforce consent judgments against insurers. In *Glenn*, 247 Kan. at 318, our Supreme Court addressed the reasonableness of assignment agreements and covenants not to execute "in which the amount of the judgment assigned has been determined by agreement of the parties" because such a "consent judgment" between the claimant and the insured may not represent an arm's length determination of the value of the claim.

The court held that a nonjury judgment that follows an assignment agreement and covenant not to execute may be enforced against an insurer found in bad faith or negligent for refusing to settle if the judgment "is reasonable in amount and entered into in good faith." *Glenn*, 247 Kan. at 318. The initial burden of presenting a prima facie case to establish reasonableness and good faith rests on the plaintiff and the ultimate burden of

27

persuasion is the responsibility of the insurer. The court explained that this rule would discourage collusive or overreaching burdens on insurance carriers, but would encourage settlement to protect insureds after the insured had been abandoned by its insurance carrier. 247 Kan. at 318-19.

The proof required to satisfy the plaintiff's burden requires, "at a minimum, enough information for the district court to make an independent evaluation of the reasonableness of the settlement." *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 841, 934 P.2d 65 (1997). For example, affidavits with documentation or independent expert testimony evaluating the strengths and weaknesses of the parties' positions could be presented. These factors may be considered to determine reasonableness of the settlement amount:

- the releasing person's damages;
- the merits of the releasing person's liability theory;
- the merits of the released person's defense theory;
- the released person's relative faults;
- the risks and expenses of continued litigation;
- the released person's ability to pay;
- any evidence of bad faith, collusion, or fraud;
- the extent of the releasing person's investigation and preparation of the case; and
- the interests of the parties not being released.

*Associated Wholesale Grocers, Inc.*, 261 Kan. at 841.

Factors that show whether a settlement is collusive include arm's-length bargaining, unrealistic computation of damages, absence of discounting, and secrecy. *Associated Wholesale Grocers, Inc.*, 261 Kan. at 841-42.

28

Here, the garnishment court determined that the judgment was not a consent judgment because the parties did not stipulate to a judgment amount. Rather, the assignment agreement provided that the court would determine damages based on the evidence presented. We recognize that the damages claimed by the Gruber Estate were uncontested by the Marshall Estate and the district court adopted the damage amount exactly as asserted. But even though the damages were uncontested, the court decided that no showing of reasonableness and good faith under *Glenn* was needed here. It was the court that determined the damages, not the parties.

The federal district court in *Dyer v. Holland*, No. 95-1359-JTM, 1997 WL 807866, at *6 (D. Kan. 1997) (unpublished opinion), reached a similar conclusion. The *Dyer* court was "convinced the Kansas Supreme [C]ourt would not apply the rule announced in *Glenn* to an uncontested judgment after an assignment and agreement not to execute where the agreement does not set the amount of damages." *Dyer*, 1997 WL 807866, at *6. The court reasoned that a contrary holding would encourage insurers to not defend questionable claims and instead wait to collaterally attack any judgment rendered against their insured. The court also noted that, unlike cases in which the amount of judgment was set by a settlement agreement, the insurer could have protected itself by intervening in the case. The insurer was thus bound by the judgment because it failed to intervene.

The 10th Circuit affirmed:

> "Dyer is not attempting to enforce a settlement agreement wherein the amount of damages was fixed by the parties and resulted in a consent judgment in that amount. Rather, Dyer is attempting to enforce a judgment entered by a district court in which the court, after trial, fixed damages in the amount of $1,066,484.00. In this latter regard, the Agreement between the parties in the present case specifically stated that the amount of damages was to be determined by the district court, which it was. We reject counsel's suggestion that *Glenn* permits an AG challenge to the reasonableness of the judgment

29

entered in the underlying proceeding in the ensuing garnishment proceeding. AG lost its opportunity to challenge the judgment entered in the underlying proceeding, both as it relates to the court's finding of negligence and the amount of damages, when it failed to appear and defend Sports World in the underlying proceeding." *Dyer v. Sports World, Inc.*, No. 98-3007, 1999 WL 482078, at *4 (10th Cir. 1999) (unpublished opinion).

Here, the Marshall Estate did not consent to a judgment amount. USAIG had notice that the parties were entering into an assignment agreement and were in fact given a copy of the agreement. As the garnishment court pointed out, USAIG could have intervened in the case at any time before the July 20, 2016 hearing. When the garnishment court has already determined the reasonableness of the judgment amount, USAIG cannot ask for a retrial in the garnishment action. An independent fact-finder has already decided liability and damages. See *Blann*, 22 F. Supp. 3d at 1182.

Despite all of this, concerns do arise. Even when a judgment amount is not agreed upon, there is still a potential that the ultimate judgment amount will not reflect the true value of the claim when the plaintiff's evidence is not tested by the defendant. Here, the Marshall Estate did not hire its own expert to evaluate damages, nor did it cross-examine the Gruber Estate's witnesses. The trial court was asked to make an independent judgment of the damages, but it had no evidence to use other than what was provided by the Gruber Estate.

Thus, even though this was not a true consent judgment, application of some form of the *Glenn* test is prudent. In *Brockmann v. Board of County Comm'rs*, 404 Fed. Appx. 271, 281 (10th Cir. 2010) (unpublished opinion), it was "disingenuous at best" to argue the plaintiff and insured did not agree to a settlement amount. And in *O'Shea v. Welch*, No. 01-2336-JWL, 2004 WL 2457802, at *6 (D. Kan. 2004) (unpublished opinion), the court held that the trial was like a default judgment.

30

We need not decide whether the *Glenn* test must be applied to this situation because, if we applied it, in our view, the trial court did not err in determining the Gruber Estate met its burden of making a prima facie case showing that the assignment agreement was entered in good faith and the amount of the judgment was reasonable. And the Marshall Estate failed to carry its ultimate burden of persuasion.

In the tort action, the Gruber Estate offered around 20 exhibits, submitted a detailed trial brief, and presented nine witnesses including an accident reconstruction expert and an economist. The court entered judgment in an amount it considered fair, reasonable, and supported by the evidence.

The court in this garnishment action meticulously analyzed each relevant *Associated Wholesale Grocers, Inc.* factor in detail. This was not a case in which a judge just signed a journal entry prepared by one of the parties. The court was very thorough. In response, USAIG argues only that it did not abandon its insureds, it was not notified of the July 20 hearing, and it did not have a chance to contest liability or damages.

We have already dealt with USAIG's negligence and bad faith in handling the voluntary settlement. Although USAIG was not notified of the July 20 hearing, USAIG had many opportunities to intervene. The Gruber Estate made a prima facie showing of the Marshall Estate's sole liability and the reasonableness of damage award.

*We address two cross-appeal issues.*

**Interest on the judgment**

For an insurance carrier, one of the perils of failing to defend its insured is the possibility that it must pay for interest on a judgment against the insured.

31

In its cross-appeal, the Gruber Estate contends that interest should start on July 20, 2016—the date that judgment was entered against the Marshall Estate. The Gruber Estate presses home two points: one statutory and one contractual. It argues that since the amount of damages was never at issue in the garnishment action, the only question before the court was whether USAIG was liable for the damages. The amount of the debt was set when the court entered that judgment. Thus, with the date set by the date the judgment was entered, and the amount of the debt determined at the same time, K.S.A. 16-201 calls for interest to accrue on the unpaid amount at the rate of 10 percent annually.

In the alternative, the Gruber Estate contends that prejudgment interest was due from the date of the judgment under the policy provision that states: "We will pay any interest on any part of a judgment we are paying, which accrues after entry of the judgment and before we have paid that part of the judgment, which does not exceed your 'Limit of Coverage.'" In other words, if the Marshall Estate was liable for interest, then its insurer—USAIG—was also liable.

The trial court ruled that the damages only became liquidated against USAIG as of November 12, 2018, when the court's judgment was filed in the garnishment action. The court noted that USAIG was not even a party to the action. Thus, the court ruled that prejudgment interest began on November 12, 2018, under K.S.A. 16-201. The court also noted that it would be inequitable to order USAIG to pay interest for the 223-day period where the Gruber Estate failed to perfect its garnishment action and was given leave to reply out-of-time.

For its part, USAIG contends that the debt was only fixed against the Marshall Estate on July 20, 2016, and not against USAIG. It argues that the amount owed by USAIG was undecided until November 12, 2018, because it disputed whether the judgment (resulting from an uncontested hearing) was a reasonable assessment of damages. As for the Gruber Estate's contract theory, USAIG also contends that the

32

insurance policy provision for interest is limited to any part of a judgment that does not exceed the policy's coverage limit.

*The rules we must follow are clear.*

This involves a question of law. In Kansas, interest on judgments depends on the date of the judgment and the identification of the amount of the judgment. Under K.S.A. 16-201, "Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due." In other words, prejudgment interest is allowable on liquidated claims. A claim becomes liquidated when both the amount due and the date on which such amount is due are fixed and certain, or when the same become definitely ascertainable by mathematical calculation. *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 925, 157 P.3d 1109 (2007).

When assessing interest on judgments, the cases distinguish between liability and amount. This is not a question of who has to pay, but a question of how much must be paid. Several cases instruct us. First, a good-faith controversy about the liability for a liquidated claim does not preclude the grant of prejudgment interest. *Owen Lumber Co.*, 283 Kan. at 926. And, specifically, a good-faith controversy concerning the existence of insurance coverage does not preclude the grant of prejudgment interest when the amount in controversy is not seriously disputed. *Crawford v. Prudential Ins. Co.*, 245 Kan. 724, 737, 783 P.2d 900 (1989).

In other words, a claim is liquidated if the controversy is one of coverage, not amount. In a motor vehicle accident case, the court in *Mitchell v. Liberty Mut. Ins. Co.*, 271 Kan. 684, 706, 24 P.3d 711 (2001), held that prejudgment interest was due from the date of the judgment where the only issue in the later action was which of two insurance companies was liable. In that case, in March 1995, it was determined that Shelter Insurance Company had to pay its policy limit of $50,000 if Liberty was found not liable.

33

Liberty was found not liable four years later in October 1999. The court held that interest accrued from March 1995—the date of the judgment. Shelter had to pay its policy limits plus interest. 271 Kan. at 706.

Another case helps clarify this question. In *Friedman v. Alliance Ins. Co.*, 240 Kan. 229, 729 P.2d 1160 (1986), the amount claimed was around $9,000, but there was no dispute about $6,643.30 of that claim. The court held that prejudgment interest was due from the date the claim was filed on the undisputed portion of the claim—$6,643.30. 240 Kan. at 239.

We acknowledge that a decision whether to award prejudgment interest under K.S.A. 16-201 is a matter of judicial discretion and can be reversed only upon a showing of an abuse of that discretion. *Owen Lumber Co.*, 283 Kan. at 925. But this court has held that "[i]f a claim is liquidated, prejudgment interest must be awarded." *Federal Land Bank of Wichita v. Vann*, 20 Kan. App. 2d 635, Syl. ¶ 4, 890 P.2d 1242 (1995).

And another court has held as we do. In *Blann*, 22 F. Supp. 3d at 1183, a federal district court determined that the plaintiff in an action to recover an excess judgment against an insurance company was entitled to prejudgment interest from the date of the judgment.

We are persuaded that it is irrelevant that USAIG was not a party to the tort action because its insured was. USAIG agreed to ensure Marshall and his estate was later held responsible for damages because of his negligence. According to the cases we cite above, the question is: when was the amount of Gruber's damages in the wrongful death case fixed and certain? Here, that question was answered when the court entered judgment against the Marshall Estate.

34

The statute, K.S.A. 16-201, does not say that interest is stayed until liability is decided. If it did, then there would never be any incentive to settle a claim. *Owen Lumber Co.* is clear on this point. Here, the amount was fixed in the wrongful death action. But in the garnishment action, USAIG tries to nullify the statute by contesting the reasonableness of the judgment. We cannot ignore the meaning of the statute—interest begins on the date of the judgment and accrues until paid.

In our view, the judgment amount was fixed and certain upon judgment in the tort action. The trial court heard evidence in the action and found, based on the testimony and exhibits presented, that the amount of damages was $11,588,548.89. The court entered judgment for the Gruber Estate in that amount. And the Marshall Estate was liable for the damages at that point and the interest started to accrue. We hold the trial court in this garnishment action erred as a matter of law and therefore abused its discretion.

We move now to the Gruber Estate's argument about the policy provision dealing with interest. Interestingly, the cases on policy provisions such as the one in this policy lead us to hold that the outcome is the same. The Gruber Estate has a right to interest on this theory as well. Under the insurance policy, USAIG must pay interest on the entire $11 million judgment from July 20, 2016—the date of that judgment.

In the wrongful death action finding the Marshall Estate liable for about $11 million, the district court ordered interest "at the statutory rate" from July 20, 2016.

Under its insurance policy, USAIG agreed "[w]e will pay any interest on any part of a judgment we are paying, which accrues after entry of the judgment and before we have paid that part of the judgment, which does not exceed your 'Limit of Coverage.'"

A close reading illustrates our conclusion. That provision can be broken into two phrases:

(1)     "We will pay any interest on any part of a judgment we are paying." This phrase means that USAIG must pay interest on the entire $11 million judgment because that is the judgment USAIG is paying. USAIG was found liable for all of that judgment, not part of it.

(2)     "which accrues after entry of the judgment and before we have paid that part of the judgment, which does not exceed your 'Limit of Coverage.'"

Cases interpreting similar policy provisions reveal that interest continues to accrue from the judgment date until the policy limit *and interest on the entire judgment* has been paid. In fact, the court in *Stamps v. Consolidated Underwriters*, 208 Kan. 630, 493 P.2d 246 (1972), construed a similar provision to mean that interest accrued on the entire judgment, irrespective of the policy limits.

> "A so-called standard interest clause in a liability insurance policy is considered and construed to create liability for interest on the entire judgment awarded so as to render the insurer liable for such interest until the amount of the policy limit, plus interest on the whole judgment, has been tendered, offered or paid." 208 Kan. 630, Syl. ¶ 2.

The reason is to prevent insureds from having to pay the interest on excess judgments that were the fault of the insurer:

> "The purpose of the supplementary payments provision stating that an insurer will pay all interest on the entire amount of the judgment is to protect the insured when the insurer decides to contest liability and a judgment in excess of the policy limits is returned against the insured. 12 Couch on Insurance 3d § 170.43 (1998). See *Stamps v. Consolidated Underwriters*, 208 Kan. 630, 635, 493 P.2d 246 (1972)." *Mitchell v. Liberty Mut. Ins. Co.*, 271 Kan. at 707.

In a case interpreting a similar policy provision, our Supreme Court held that the insurance company was responsible for interest on the entire underlying judgment beginning on the date of that judgment until all the interest and the policy limits were

36

paid: "The payment or tender of only the policy limits was insufficient to stop the running of interest on the entire 'amount of any judgment.'" *Glenn*, 247 Kan. at 310.

All of these cases show that the law tries to protect the insured. An insurer cannot, through its negligence or inaction, expose its insured to pay interest on judgments such as the one entered here.

Thus, under either theory, application of the interest statute or insurance contract provision, the Gruber Estate has a right to interest on its judgment from the date judgment was entered. We remand the issue to the district court for its computation of accrued interest.

**We hold the court erred in denying attorney fees.**

The garnishment court found K.S.A. 40-908 inapplicable because no judgment was entered against an insurance company, nor on a policy "to insure any property in this state against loss by fire, tornado, lightning, or hail." The court ruled the statute did not apply to a garnishment action in which an assignee of an insured pursues a bad-faith claim; such is not a claim "on any policy."

In a cross-appeal, the Gruber Estate contends that the garnishment judgment was a judgment against an insurance company on a policy and K.S.A. 40-908 applies even if the loss being pursued is not a property loss. The Gruber Estate contends it matters only what "type of policy" is at issue, no matter if the coverage for property loss had been exhausted. The Gruber Estate asks us to remand with directions to award a reasonable amount of attorney fees.

Opposing this view, USAIG offers several arguments. It contends there was no judgment rendered against an insurance company because the judgment was entered

37

against the Marshall Estate and USAIG was not a party to that proceeding. USAIG argues the judgment against it was not "on any policy" because the judgment sounded in negligence and bad faith. It also stresses that because it had paid the property damage claims before this action began, the coverage was exhausted, and the policy no longer insured "any property in this state against loss by fire, tornado, lightning, or hail."

*A review of the law is helpful at this point.*

The statute controlling this issue has three requirements. An award of reasonable attorney fees is allowed under K.S.A. 40-908 if:

- judgment is rendered against any insurance company;
- on any policy; and
- given to insure any property in this state against loss by fire, tornado, lightning, or hail.

A district court's award of attorney fees is reviewed for abuse of discretion. *Wenrich v. Employers Mutual Ins. Co.*, 35 Kan. App. 2d 582, 595-96, 132 P.3d 970 (2006). But interpretation of K.S.A. 40-908 is a question of law subject to unlimited appellate review. *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

We now examine the record to see if all three requirements are met here.

**1.      Judgment was rendered against an insurance company.**

The trial court found K.S.A. 40-908 inapplicable because no judgment was entered against an insurance company. But the judgment in the subsequent garnishment action was a judgment rendered against an insurance company.

## 2.    Judgment was rendered on a policy.

The court ruled the statute did not apply to a garnishment action in which an assignee of an insured pursues a bad-faith claim; such is not a claim "on any policy." But an insurer's negligent or bad-faith failure to settle within a policy's limits breaches its contract with the insured. *Roberts v. Printup*, 595 F.3d 1181, 1186-87 (10th Cir. 2010); see *Glenn*, 247 Kan. at 313-14. And the trial court in this garnishment action found that USAIG "negligently and in bad faith breached its contract with its insured" and ordered that USAIG was liable for the judgment against the Marshall Estate. This judgment against USAIG was a judgment on the insurance policy for breach of contract.

The right to claim attorney fees became the Gruber Estate's right through the garnishment proceeding. The Gruber Estate stepped into the shoes of the insured, Marshall, to collect judgment against USAIG. See *Smith*, 14 Kan. App. 2d at 164.

In *Coleman v. Holecek*, 542 F.2d 532, 538 (10th Cir. 1976), the court applied a different attorney fee statute (K.S.A. 40-256) to a garnishment proceeding because the statute was compensatory and thus the garnisher as well as the insured should be permitted to recover costs of enforcing the insurance policy.

## 3.    The insurance policy was given to insure any property in this state against loss by fire, tornado, lightning, or hail.

Key to this is what the policy covers, not the type of loss. Attorney fees may be awarded under K.S.A. 40-908 regardless of the type of loss incurred, so long as the insurance policy at issue covered losses by fire, tornado, lightning, or hail. Our Supreme Court explained:

> "The plain language of K.S.A. 40-908 states that it applies to any case in which a judgment is rendered on *any policy* given to insure any property against loss by fire,

39

tornado, lightning, or hail. The policy controls, not the actual type of loss. If the loss is covered by a policy which insures against fire, tornado, lightning, or hail, the statute applies regardless of whether the actual loss occurred by one of those named causes or some other cause covered by the same policy." *Hamilton*, 263 Kan. 875, Syl. ¶ 3.

Several cases have held that the statute applies to liability claims for bodily injury as well as property claims if the policy also insures property against loss by fire, tornado, lightning, or hail. *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 727-29, 317 P.3d 70 (2014); *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 281 Kan. 844, 861-62, 137 P.3d 486 (2006); see *Blann*, 22 F. Supp. 3d at 1183-84 (applying K.S.A. 40-908 to claim that insurance company was liable for excess judgment in a wrongful death case).

The garnishment court ruled that the property damage coverage ended when USAIG paid the policy limit of $130,000 for the aircraft and the action had nothing to do with property damage, but was a liability claim.

But the question is whether the insurance policy was "*given* to insure any property in this state against loss by fire, tornado, lightning or hail." (Emphasis added.) K.S.A. 40-908. Those types of property losses were in the policy that was given to Marshall. It makes no difference that USAIG had exhausted its obligation under that coverage. The court read something into the statute that is not there.

Each requirement of K.S.A. 40-908 was met here and the court erred as a matter of law in ruling otherwise. With that interpretation in mind, we remand this case to the district court for further proceedings on the issue of attorney fees.

We affirm the trial court's judgment against USAIG. We reverse the trial court's

holding that denies interest on the judgment and its order denying attorney fees. We remand for the trial court's computation of accrued interest and attorney fees.

Affirmed in part, reversed in part, and remanded with directions.